Parker, C. J.,
delivered the opinion of the Court. The proceedings under the insolvent act of the State of Mew York are admitted to have been regular; so that the question referred to us is, whether the plaintiff is barred of his suit on this demand, under the circumstances disclosed in the statement of facts ; the point being to be considered in the same light, as if the certificate of discharge had been regularly set forth in a plea in bar to the action, and an issue in law joined on the sufficiency of such plea.
* The law, under which the defendant claims to be discharged, is a general law, intended to affect all the citizens of the State of Mew York at least; and it provides a system, by which an insolvent debtor may, upon his own application, or upon the petition of any of his creditors, be holden to surrender all his property, and be discharged from all his debts. It is therefore a bankrupt law, and to be distinguished from insolvent laws, technically so called. The question, then, put in a general form, is, whether a discharge under a bankrupt law of any State can be effectually pleaded in bar of an action brought in another State, of which the creditor is a citizen ; the contract, which is sued, having been made within the State which enacted the law, and the debtor being there a citizen and subject at the time of making it.
*12 This is a question important in its nature and consequences, and has received the attention it deserves, having been argued in several parts of the Commonwealth, in cases of a similar nature, which have arisen in the counties of Hampshire, Plymouth, and Suffolk.
That the laws of any State cannot, by any inherent authority, be entitled to respect exterritorially, or beyond the jurisdiction of the State which enacts them, is the necessary result of the independence of distinct sovereignties. But the courtesy, comity, or mutual convenience of nations, amongst which commerce has introduced so great an intercourse, has sanctioned the admission and operation of foreign laws relative to contracts ; so that it is now a principle generally received, that contracts are to be construed and interpreted according to the laws of the Stale in which they are made, unless from their tenor it is perceived that they were entered into with a view to the laws of some other State. And nothing can be more just than this principle. For, when a merchant of France, Holland, or England, enters into a contract in his own country, he must be presumed to be conusant of the laws of the place where he is, and to expect that his contract is to be * judged of and carried into effect according to those laws ; and the merchant with whom he deals, if a foreigner, must be supposed to submit himself to the same laws, unless he has taken care to stipulate for a performance in some other country, or has, in some other way, excepted his particular contract from the laws of the country where he is.
The rule does not apply, however, to the process by which a creditor shall attempt to enforce his demand in the courts of a State other than that in which the contract was made. For the remedy must be pursuant to the laws of the State where it is sought ; otherwise great irregularity and confusion would be introduced into the form of judicial proceedings. These principles have been well discussed in several cases in this Court in former periods ; particularly in those of Pearsall & al. vs. Dwight, cited in the argument, and Powers vs. Lynch. (7)
This general rule, however, does not reach far enough to settle the question in this case ; for it cannot easily be maintained, that a law, which authorizes the discharge of a contract upon terms different from those provided for in the contract itself, amounts to a construction or interpretation of it. Some other ground must, therefore, be resorted to ; and we think it may be assumed, as a rule affecting all personal contracts, that they are subject to all the consequences attached to contracts of a similar nature by the laws of the country where they are made, if the contracting party is a subject of, or res-.dent in, that country where it is entered into, and no provision is *13 introduced to refer it to the laws of any other country. Thus, if an American merchant becomes the creditor of an English merchant in England, either personally or by agent, and the English merchant becomes bankrupt, and obtains a certificate of discharge, the American merchant will be concluded by such certificate ; for it is reasonable to suppose, that both parties knew of the existence of the bankrupt laws of England, and the contract must be presumed to have been made with reference to those laws. Indeed, merchants doing business abroad are always supposed conusant of the *laws of the place where they transact their business, and to submit themselves to such laws, and even to such customs as are found there to exist.
But, as the laws of foreign countries are not admitted ex proprio vigore, but only ex comitate, the judicial power will exercise a discretion with respect to the laws they may be called upon to sanction ; for, if they should' be manifestly unjust, or calculated to injure their own citizens, they ought to be rejected. Thus, if any State should enact, that its citizens should be discharged from all debts due to creditors living without the State, such a provision would be so contrary to the common principles of justice, that the most liberal spir of comity would not require its adoption in any other State.† So, if a State, under the pretence of establishing a general bankrupt law, should authorize such proceedings as would deprive all creditors living out of the State, of an opportunity to share in the distribution of the effects of the debtor, such a law would have no effect beyond the territory of the State in which it was passed.
It has been said, that personal contracts have no situs or locality ; but that they follow the person of the creditor wherever he goes. The general position means nothing more, than that such contracts may be enforced in any other country, and that the debtor may be arrested, or his property sequestered, to secure the debt, accord ing to the laws of the country where the creditor shall seek his remedy. This is not inconsistent with the other principle, that the lex loci shall operate in the. construction of the contract, and even in the dissolution of it.
There are not many authorities directly in point upon this question, even in England, where it was to be expected, that cases of this kind would have frequently occurred. In every case, however, happening in that country, in which the effect of a foreign bankrupt law has been discussed, we find that the place where the contract was made * has been the circumstance of principal consideration with the Court.
In the case of Ballantine vs. Goulding, (8) the dictum of Lord' *14 Mansfield is broad enough to terminate the controversy. He says, “ What is a discharge in the country where the contract was made is a discharge everywhere.” But it is hnsafe to take these general propositions of judges, however eminent, as rules of decision ; for it often happens, that they are limited in their application, although not in their expression. The report of this case, also, is not sufficiently minute to authorize its reception as a conclusive precedent. And even this dictum leaves open the question, whether a discharge will affect any creditors, but such as are resident in the country where t was obtained ; for the position is, “ What is a discharge in the country, &c., is a discharge everywhere.”
The same doctrine, however, is recognized by Lord Ellenborough in a subsequent case, (9) which amounts almost, if not entirely, to a definitive settlement of the question in England; and the reasons there given are such as will justify us in coming to the same decision here.
In the case of Smith & al. vs. Buchanan, (10) the plea, of a dis charge under an insolvent, law of Maryland, was disallowed ; because the debt sued was contracted in England, and the plaintiffs were English subjects and resident in England. The decision of this cause, if it had been put altogether upon the ground, that it did not appear that the debt was contracted in Maryland, would have furnished pretty strong authority, although in negative terms, for the defence under the certificate in the case at bar. But, as another reason was coupled with that, namely, that the plaintiffs were English subjects, this case cannot be considered as having much influence upon the question ; as it cannot be ascertained, from the report of the case, what influence was attributed to the locus contractus, and what to the residence of the contractor.
In the case, however, of Potter & al. vs. Brown, before * referred to, the point seems distinctly decided. The plea in bar set forth the bankrupt law of the United States, a surrender and regular discharge under it; and it contained an allegation, that the demand, upon which the action was brought, originated within the State of Maryland ; and it was further alleged, that the plaintiffs, being English subjects, had a house of trade in Baltimore, within the said State, and that one of the plaintiffs resided there, having charge of the said house. It was determined, that this was a good bar, on the ground, that the contract was discharged according to the laws of the place where it was made ; and the general doctrine advanced by Lord Mansfield, in the case of Ballantine vs. Goulding, was recognized and adopted, namely, “ that a lawful discharge in the country where the contract was made is a discharge everywhere ” *15 The facts stated in the plea, relative to the residence of one of the plaintiffs, and the having a house of trade in Baltimore, do not appear to have been adverted to by the Court, or urged by the counsel in the argument; so that we must conclude, that those circumstances had no influence upon the decision. This, however, is not an authoritative precedent in this Court ; although it undoubtedly has great weight, as the deliberate opinion of very learned men, in a country where the principles of law are so well understood, and so correctly applied in practice.
Upon examination of the reports of judicial decisions of several of the State Courts, we are not able to find any direct adjudication upon this question.
In Pennsylvania, they admit the operation of laws of other States, so far as to discharge from arrest or bail debtors who have been discharged under those laws in the States where they reside; provided such States show the same comity towards them. (11) But no case has occurred there, calculated to produce a decision as to the final effect of such a discharge upon the debt itself, the creditor living in a different State from that which passed the law.
In the State of New York, the effect of insolvent laws *of other States has frequently been discussed, upon applications to be discharged from bail, and otherwise. The uniform decision there has been, that the discharge is not available against demands which did not originate within the Stale where the laws existed : and the opinion of the Judges is very strongly intimated, that such laws are confined in their operation to contracts which have an implied reference to those laws, being made under their jurisdiction. (12)
The same inference may be drawn from the case of Greenough vs. Emery, (13) adjudged in the Circuit Court of the United States, within the State of Pennsylvania; the reason given for holding the plea of discharge, under an insolvent law of that State, bad, being, that the contract, against which it was pleaded, was made in the State of Massachusetts. ,
In this State, several cases have occurred which brought into view the insolvent laws of some of the other States ; and, although none of them presented the general question which is no°w before us, it has been contended, that a different principle has been adopted from that which appears to have prevailed in England, and in the other States of the Union. Upon a critical investigation, however, of the several cases referred to, it will not appear, that any definitive opinion *16 has been adopted, although there have undoubtedly been expressions of some of the Judges, which have the tendency suggested.
The first case is that of Proctor vs. Moore. (14) There a Con necticut debtor was sued in Massachusetts, by a creditor of the latter State. A discharge, under a resolve of the legislature of Connecticut, was pleaded in bar of the action ; and it was holden to be no bar ; because it did not appear by the plea, that the contract was made in Connecticut, or that the plaintiff resided there. This is analogous to the decisions in Mew York, and in the Circuit Court of the United States, and also to the case of Smith vs. Buchanan, in England, before cited. There is a strong intimation in * all these cases, that the place where the contract is made shall determine whether the discharge shall affect it or not. But still, the stress apparently laid upon the domicil of the creditor leaves a doubt as to the decision of the general principle. Perhaps, however, a virtual residence of the creditor where the contract was made would be implied, or at least a virtual assent to the laws of the State.
The next case is that of Baker vs. Wheaton, (15) upon a note made in Rhode Island, the promissor and promissee being both citizens of that State, and a discharge having been obtained by the promissor under its laws, before the note was indorsed to Baker, the plaintiff, who was a citizen of Massachusetts. The only point decided was, that the discharge would avail against the indorsee as well as the promissee ; because the note was dishonored at the time of its indorsement and before. A dictum of Parsons, C. J., is, however, much relied on by the plaintiff’s counsel in this case. The words are ; “ If, when the contract was made, the promissee had not been a citizen of Rhode Island, he would not have been bound by the laws of it in any other State.” This proposition, taken in an unlimited sense, is undoubtedly adverse to the position now taken by us. But, considering it with a proper reference to the case then before the Court, we can perceive no repugnance.
The law, under which the discharge was obtained, was a special law, made after the existence of the contract against which it was pleaded ; and it might well be held, that none but citizens of the State could be liable to the effects of such a law. Indeed, it is difficult to perceive how a law, which directly impairs the obligation of contracts, can have any effect, even against the citizens of the State which enacts it ; such a law being directly repugnant to an express provision of the Constitution of the United States. Perhaps, however, the long established usage in the State of Rhode Island, of legislating upon each particular case of bankruptcy which occurs there, mtght *17 place creditors, * dealing with Rhode Island debtors, upon the same footing as they would be in regard to debtors of a State in which there should be a permanent bankrupt or insolvent law. But of this we give no opinion. Had there been, in the State of Rhode Island, a general, permanent system, by which all debtors, in case of misfortunes, might be relieved from their debts, and a contract had been made within that State, during the existence of such a law, we apprehend, a different opinion, as to the effect of a discharge under such a system, would have been adopted.
The next and last case, which has arisen in this State, in which the insolvent laws of another State have been under consideration, is that of Watson vs. Bourne; (16) and there is nothing in the case itself, which necessarily required any opinion upon the question now before us. A contract, which was not originally affected by the law, was sued within the State of Rhode Island, and had passed in rem judicatam; the question was, whether it bad acquired any new locality, so as to be affected by a general discharge of the debtor, in pursuance of a law of that State, passed after the rendition of the judgment. In the opinion, however, delivered by the late Chief Justice Sewall, the following observation, if not restricted to the case immediately before him, would confine the operation of laws of this nature entirely to the limits of the State which passed them. His words are, “ A discharge can only operate, when the law is made by an authority common to the debtor and creditor in all respects ; where both are citizens and subjects.” But the very generality of this expression proves that it was considered applicable only to the case immediately under consideration. For it cannot be supposed, that the learned Judge would have excluded from the operation of the acts of any particular State contracts made within the State, and- tc be performed there, between parties resident there for the purpose of trade. And yet such parties may have been neither citizens nor * subjects, except in a very limited sense ; and not at all, until long after the enacting of the law.
The observations, which have been made upon the dictum of Chief Justice Parsons, in the case of Baker vs. Wheaton, are applicable to the observation of Chief Justice Sewall in the last cited case. Both these learned Judges spoke in reference to the particular acts of discharge by the legislature of Rhode Island, and not concerning a general bankrupt or insolvent law; none such existing in that State.
Finding, therefore, no decision of our own courts upon the subject Defore us, and being satisfied that the general cast of the authorities, zited from the decided cases in England, and some of the sister *18 States, is in favor of giving effect, to such discharges, as to all con tracts made within the State where they are authorized, we adopt tins principle as the law relating to personal contracts.
But there is another general objection to the effect of the insolvent law, on which the defence in this case rests, which, if well maintained, will supersede all others. This is, that it is void, as repugnant to the-Constitution of' the United States.
The argument, in support of this objection, has been divided into two branches ; one founded on a clause of the eighth section of the first article of the Constitution, which vests the power of making uniform laws on the subject of bankruptcy in Congress ; and the other upon the clause which prohibits the several States from passing any laws which shall impair the obligation of contracts.
With respect to the first branch, we are not of opinion that the power of the States to legislate upon that subject is taken away, merely because a general authority upon the subject is given to Congress. The authority so given is, to pass uniform laws on the subject of bankruptcy ; and in order to give this provision full effect, there is no doubt, that, if an uniform law should be passed by Congress, the respective acts of the several States would be superseded ; * because their existence would then be not only unnecessary, but inconsistent with that uniformity which it was the wish of the people to establish.
Whether particular insolvent laws, made in peculiar exigencies, would fall within the reason of this objection, we do not undertake to decide.
At the time the Constitution was framed and adopted, some of the States had insolvent laws, and others had not ; and, probably, where they existed, there was a great diversity in their provisions and effects. The establishment, therefore, of a general and uniform system was undoubtedly desirable, and, for that reason, the power was given to Congress. But it never could have been imagined, that, if Congress did not choose to exercise the authority given them, the several existing laws were to become extinct, merely because there was a power to supersede them vested in another body.
Such an effect cannot be inferred, either from analogous expressions in the Constitution, or from the practical construction of that instrument. For it is well known, that several of the States had insolvent laws at the time of the adoption of the Constitution, which continued in practical operation afterwards ; some of them have passed laws of the kind since the actual administration under that Constitution ; and it does not appear that any exception has been taken, in the State courts or elsewhere, to the validity of those laws. Indeed, the words of the Constitution themselves seem to imply the existence and continuance of local laws of this nature, until super *19 seded by an exercise of the power vested in Congress. The power given is not, to make laws on the subject of bankruptcy, which, by construction, might amount to an assumption of the authority preexisting in the State legislatures ; but to make uniform laws, the obvious import of which is, that Congress is to have the power of equalizing the effects of a system of bankruptcy over the whole united nation. Correspondent with this idea, we find that the Congress, which passed *the bankrupt law of 1800, in the sixty-third section of that act, recognized and even provided for the continuance of the existing State insolvent laws.
It may be also observed, that there is no clause in the Constitution, prohibitory of the exercise of this power by the several States ; although such clauses are to be found in regard to other powers, which are given to the general government. For instance, power is given to lay and collect taxes, duties, imposts, and excises. It cannot surely be contended, that, because of this power, the States have ceased to enjoy the right of laying and collecting taxes. If such were the true construction of the Constitution, the State governments would all have expired, the moment the general government began to live. But the Convention was aware of no such consequence. On the contrary, it supposed that there might be a concurrent power ; and therefore took care expressly to prohibit the States from establishing imposts or duties on imports and exports , leaving the States respectively to exercise the power of laying taxes of a different kind from imposts, and of establishing excises, as they had before done. Congress have power to declare war, to grant letters of marque and reprisal, to raise and support armies, to provide and maintain a navy, &c. ; and yet it was deemed necessary to prohibit the States from the exercise of these attributes of sovereignty. From which it may be clearly inferred, that the mere giving of powers over certain objects to Congress did not necessarily deprive the State legislatures of the same powers antecedently enjoyed by them ; unless the exercise of those powers should interfere with the authority of the general government ; in which case the power of the State must undoubtedly give place.
We are aware of the able and elaborate argument of Judge Washington on this subject, in the case of Goulden vs. Prince, in the Circuit Court of the United States, referred to by the plaintiff’s counsel; but, with all our respect for the reasoning of that learned Judge, we cannot * yield assent to his opinion. It seems to us, that he overlooked the important circumstance, that the State governments were in existence, with full legislative powers, at the time when the Constitution of the United States was made ; and that whatever powers were not expressly and exclusively given by the people to the national government remained *20 where they were before, namely, with the State legislative authority. The people resumed nothing from their legislatures, but what they expressly gave to Congress.
Tt would seem, in order to support the position contended for, that the State governments must be supposed to have been dissolved, when the national Constitution was submitted to the people ; or, at most, that they continued provisionally only, until the national government had commenced its operation, and then, that the State legislatures ceased to have power upon any subjects which even potentially came within the purview of national authority. But we apprehend that each State had full dominion, within the limits of its Constitution, over all subjects which remained unimpaired, except so far as the people had expressly transferred part of the power to the general government.
The learned Judge has instanced the subject of naturalization, to enforce his construction of the Constitution ; and thinks it very clear, that, if Congress had passed no uniform law on that subject, the several States would be prohibited from naturalizing foreigners ; because the power to naturalize is given to Congress. But we think it at least doubtful, whether, if Congress had provided no rule of naturalization, the States might not have still exercised the power which they were accustomed to use. • For it can hardly be thought, that a sovereign State, which was desirous of replenishing its population, by encouragement to foreign artizans, or other valuable emigrants, had deprived itself of this privilege, because it had given a power to Congress, but which was never exercised, of establishing a general system upon the same subject. If the * States should abuse the power, either of' naturalization or of making bankrupt laws, the remedy is at all times in the hands of Congress. Let them establish an uniform system, and the particular systems are at once overthrown. The power of naturalization, however, considering the effect of its exercise upon all the States of the Union, may be essentially national, and, for that reason, not proper to be exercised by any individual branch of the nation.
A strong instance of the inconvenience of the doctrine contended for exists in another provision of the Constitution. Congress has power to fix the standard of weights and measures throughout the United States ; but they have not, to this day, exercised that power. Will it be pretended, that the several State authorities have lost their power to fix such a standard within their respective jurisdictions ? If they have, then, probably, all the States have acted in open defiance to the Constitution on this subject, ever since it was adopted.
Probably, the correct exposition of the Constitution on this point is, that, in whatever cases power is given to Congress, which was before enjoyed by the State governments, the same power may be exercised *21 Dy the State legislatures, until Congress shall have superseded the necessity, by passing a general law ; unless by an express prohibition the State is interdicted from the use of such power.
We are more satisfied with the reasoning of the learned Judge, upon the other branch of the argument, which relates to laws impairing the obligation of contracts. A law, which is in force-when a contract is made, cannot be said to have that effect; for the contract, being made under the law, is presumed to be made with reference to it, and the parties are legally conusant of it at the time. The contract in such case is not impaired by the law ; for the law is a part of the contract. A law, made after the existence of a contract, which alters the terms of it by rendering it less beneficial to the creditor, or by defeating any of the terms which the parties had agreed upon, essentially * impairs its obligation, and, for aught we see, is a direct violation of the Constitution of the United States. (17)
It has often been observed by those who have advocated a bankrupt or insolvent law in the legislature of this Commonwealth, with a view to the relief of an unfortunate class of debtors from existing embarrassments, that the object of the framers of the Constitution, in this prohibition upon the States, was to prevent tender laws and other expedients of a like nature, which had been resorted to in some of the States, to the great prejudice of creditors ; and that this article of the Constitution ought to be construed with reference to such intention. But the words are too imperative to be evaded. “No State shall emit bills of credit, make anything but gold and silver a tender in payment of debts, pass any bill of attainder, or ex post facto law, or law impairing the force and obligation of contracts.” It would be contrary to all rules of construction, to limit this latter clause of the prohibition to a subject which is expressly prohibited in a preceding sentence. Full operation ought to be given to the words of an instrument so deliberately and cautiously made as was the Constitution of the United States.
There may be laws made,'even after , the execution of a contiaut, varying the remedies which before existed, which would not be liable to this objection. It has been contended in this case, that the debt sued for arose before the law, under which the discharge is claimed, was passed. But this point is not satisfactorily made out. There was an account current between the parties, prior to the 3d of April, 1811, when the insolvent law passed. But the account was not settled, and the balance struck, until the 22d of the same April ; and we think the debt did not exist until that time. It is true, the difference in point of time is small; but we cannot depart from the rule, to suit the equity of the case. A law providing for the dis *22 charge of the debtor when the contract was formed, the contract must be held subject to that law ; because it was made * with an implied reference to it; and the discharge having been regularly obtained, it is a bar to the plaintiff’s action.

Plaintiff nonsuit.

[See Blake vs. Williams & Trustee, 6 Pick. 286. — Ogden vs. Saunders, 12 Wheat. 213.—Ed.]

 4 Mass. Rep. 77.

 Ingraham vs Geyer, post, p. 146. Tappan vs. Poor, 15 Mass. Rep. 419.

 1 Cook s Bank. L. 347.

 Potter & al. vs. Brown, 5 East, 124.

 1 East,

 Smith vs. Brown, 3 Binney's Rep. 201.

 3 Caines' Rep. 154.— Van Raugh vs. Van Arsdaln, 1 Dall. Rep. 229. — Millar vs Hall, 2 Johns. Rep. 198. — Smith vs. Spinola, Ib. 235. — Smith vs. Smith, 7 Johns 117.

 3 Dallas, 369.

 1 Mass. Rep. 199.

 5 Mass. Rep. 511.

 10 Mass. Rep. 337

 Call vs. Hagger & al., 8 Mass. Rep. 423.