Mr. Justice Scott, delivered the opinion of the court. The first question to be determined is that presented on the part of the State of Arkansas, who, by her counsel contends that no suit can be brought against the State, without her consent, and then only in the mode indicated by that consent, and insists that, by the law arising upon the facts in this record, no such consent has been given as to make her amenable in this case. And this question is to be solved by an exposition of our constitutional and statutory provisions touching the point in the light thrown upon them by the principles of the common law and the regulations of the English statutes on this subject, or, in other words, by the general principles of public or municipal laws and. the known usage of other enligetened nations. And it may be safely assumed that it was never contemplated by the people when they instituted the government under which we live that the rights of property should be less secure under our institutions, than under those of other enlightened and refined nations that had before arisen in the world. Because, it was the great purpose of all our regulations to elevate individual man by securing for him all his more important rights that he might have a staid foundation and k free scope for the pursuit of happiness. That the subject should be allowed to implead the sovereign in his own tribunals and have justice meted out to him according to law, has been, by no means, unknown in governments far less popular and free than.our own. Even the more despotic governments have not entirely denied this priviledge. To say nothing of the governments of the ancient world whose history affords examples in point, those of Spain, France, Prussia and England have almost always, in some form or other, allowed of this right in the subject, and in some instances, have afforded him imperative process for its vindication. Indeed the principle from which it spings has been, in theory at least, openly avowed by most, if pot all the governments as existing in their roots. In the coronation ceremony of the King of Arragon, not only was it avowed in the language used when the crown was bestowed, but also by interposing between the person of the bestower and the King elect, an impersonation of law, thereby more emphatically to declare that the law was greater than the King, and was to' remain between his subject and himself. Nor was this altogether in effect but an idle phantasm in the constitution of the Spanish monarchy, as is shown by the historical fact that after Don Diego, the son of Columbus, had wasted two years in fruitless solicitations at the court of Spain for the rights in the new world that had descended to him from his father, he resorted to the council of Indian affairs, and there obtained a legal sentence against Ferdinand. And thust by the integrity of that tribunal was placed in the enjoyment of rights that had been denied him by an unjust monarch. And it was the boast of the great Frederick of Prussia, who disdained to avail himself of any of the privileges of sovereignty when they conflicted with any of the rights of property of his subjects, that “in the estimation of justice all men are equal, whether the Prince complain of the peasant, or the peasant complain of the Prince. ” And such was the law of the Saxon Kings, and up to the time-of Edwardl. of England. And the process by which these rights of thesubject were conferred was not then precatory but mandatory and imperative, “command Henry, King of England.” Nor is it known at what precise period the law of England was changed: it is known, however, that for several centuries last passed, the process has been changed to petition of right, that although the process has been changed for the enforcement of these rights, the rights themselves have not been otherwise any the less recognized. Since the change of the law in this respect the subject, when a plaintiff, cannot proceed against the crown either for property or money, otherwise than by petition. But not so, however, when the crown enters the courts as a defendant in a suit instituted by itself as plaintiff. In that case, the crown disrobes itself of its privileges and comes down to the equality of the subject, and henceforward in the litigation of the rights touching that subject matter the subject has all the rights against the crown that under like circumstances he would have in the courts against another subject, his peer. And this will appear not only by the remarks of Lord Somers, in the Banker’s case, (1 Freeman, 331. 5 Mod. 89. Skinn. 601,) when he instances tire case of a title found for the King by office, and the subject comes into the proceedings to traverse the King’s title and show his own right to the thing, but by the other cases he cites. And is also the foundation of the Judge of the High Court of Admiralty in England in a case cited from Cal. Jur. 68, that, “In any case where the crown is a party it is to be observed that the crown can no more withhold evidence of documents in its possession than a private person. If the court thinks proper to order the production of any.public instrument that order must be obeyed. It wants no insignia of an authority derived from the crown. And doubtless upon the same foundation in a proper case, an injunction might issue from one of our courts against an unconscionable judgment obtained by the State against a citizen even in case the laws provided no means for making the State a defendant in any case. But although this might be so, and in such a case a bill in chancery, of the class of bills not original, would be the rightful remedy, this would lay no just foundation upon which the citizen could claim a right to every remedy against the State which could be achieved by all others of that class of bills, and thus include cases of wrong where the State had not by appearing in the courts as plaintiff, submitted to the jurisdiction, as seems to be contended for in argument: Because such a conclusion would be too broad for the premises, and consequently .its greater part would have no logical connexion with that foundation. Nor could the subject, when a plaintiff in a suit against the crown proceed, even by petition of right any further than the petition itself, until there had been first an act on the part of the crown, which, as an act on its part as defendant, was precisely .equivalent to that which it does as plaintiff when it goes .into the court as such; which act was an endorsement on the part of the King, “Let right be done to the partyupon which being done, unless the Attorney General confessed the suggestion contained in the petition, and the relief was thereupon awarded, a commission was issued to the proper tribunal to inquire into its truth, where the King’s Attorney pleads in bar, and tbe merits were determined upon issues of fact or demurrer in every respect as between subject and subject. This is all laid down in the old books, and is collected by the learning and industry of the several judges who deliver opinions seriatim in the case of Chisholms ex’r v. The State of Georgia, (2 Dallas R. 419,) from which we learn also that the Petition of' Right not only lay for every sort of estate in lands, but for chattels real and personal, and for rights growing out of civil injuries and those founded in contract express or implied. And that after the statute 8 Edward I, which so directed, all such petitions as touched the seal, came to the king through the hands of the chancellor; those which touched the exchequer, through the exchequer, and those which touched the justices or the laws of the land, through the hands of the justices, and all others through some chief minister. But although there was so much uniformity in the mode of presentation, there was some contrariety as to the endorsement made upon them on the part of the crown. And this contrariety seems to have determined the destination of the petition so far as the tribunal was concerned, that was to be commissioned to dispense justice touching its subject matter. The usual endorsement, however, was in the general terms we have mentioned, and in all such cases the commission went to the chancellor. But if the endorsement was special as to a particular tribunal, or otherwise, the commission corresponded. This contrariety arose in some cases from the prayer of the petition itself, as if it was special that the command should be sent to the justices to- proceed to examination, and award the justice due, the endorsement would be made accordingly, and then the justices might proceed without even any commission, the petition and the answer endorsed upon it giving them sufficient jurisdiction. And Lord Somers remarks, that, after thorough examination, he had been-unable to find even a single case where tire general endorsement had been made in any case belonging to the revenue, the usual endorsement in such case having been to the treasurer and Barons, commanding them to do justice; sometimes, however, a writ was issued from the chancery, directing the payment of the money immediately, without taking notice of the Barons. Thus it appears that an endorsement on the part of the crown was necessary in every case, and that it served the double purpose of signifying a submission to the jurisdiction of some court, and to point out the particular tribunal; the remedy by petition, being as remarked by Blackstone, “matter of grace and not matter of compulsion,” it could not proceed beyond the petition without a gracious dispensation on the part of the crown! The extent of this remedy, as we have seen, seems to have been thus received as law until the time of Lord Mansfield, who, in the case of Macbeath v. Haldeman, (1 Durn. & East 172,) in support of the doubt suggested in that case, whether the petition would then lay for a money demand touching the public supplies, distinguished such cases concerning the current expenses and public supplies of government from the great mass of other cases where the subjects might have rights against the crown, upon the ground that, since the revolution of 1688, the “supplies had been always appropriated by parliament to particular purposes, and now whoever advanced money forpublic service, trusts to the faith of parliament.” He did not, however, determine the doubt suggested, because, as he said, it was not necessary in the determination of the case before him! But he gave color to its validity not only by these remarks but by the further observation that, in such cases the proceedings would probably produce no effect,” because “if there were a recovery against the crown, application must be made to parliament, and it would come under the head of supplies for the year.” Such then was the state of the law at the time of our separation from the mother country. And upon this foundation and the still deeper one that “the King is above the laws,” which has been of the essence of the British constitution ever since the time when feudal institutions not only usurped all property in the land, but also the entire administration of justice, is based our American notion that a State cannot be sued by one of its own cisizens without the consent of the Government expressed in a constitutional form. A notion which might have been plausibly challenged, if the question was an open one in the courts of this country, as a sickly exotic in American soil, where government is not prescribed to the people by a superior power, but is merely the organ of their own sovereignty and the • creation of laws enacted by themselves, and which derive all their obligatory force from the mutual consent of those who are to render them obedience. Because in the absence of any affirmative law to create exemption from liability, and as between a citizen who created a State government and that government, on a question relating to any individual right intended to be secured to that citizen by the institution of that government, there could be no more reason for refusing the right according to the established forms of law, than there could be for refusing’ the same right against another corporation that was also created by the people, not by themselves in person, but by the exertion of the organ of their sovereignty, unless it could be shown that they had first delegated certain powers, and then surrendered to the government thus created all their other powers, which is directly in the face of the ’Bill of Rights. Because, otherwise, in a government^prely of laws, and deriving all its authority from law, there could not be any power or capacity that was above and exempt from law. Such power ought to be inactive in the people, to be exerted according to the forms of the constitution, when deemed proper for a change of the laws; and such capacity might be created for the government by an affirmative exertion of those powers, but the government could not claim it as an inherent birth-right, otherwise than the feudal Kings did, by usurpation. But the law is otherwise settled in all the courts of this country, and we shall so hold it, especially as it seems to have been so taken and accepted by the framers of our constitution, in making the provision that our Legislature should direct by law in what courts and in what manner suits may be commenced against the State. (Const. of Ark., Dig., p. 48, sec. 22.) In pursuance of this provision of the constitution, several statutes, more or less touching this subject, were enacted by the legislature at their session of 1837-8, all of which, although approved on different days, took effect on the 20th March, 1839, and- are to be construed together, as if passed on the same day, unless some of their provisions are repugnant to each other, and in that case the later is to repeal the former provision. (Dig.,p. 960, sec. 6.) Upon examination, we are unable to perceive any conflict that amounts to repugnance, and therefore the provisions of all can stand and have effect. The provision, (Dig.,p. 961, sec. 1) that “All actions against the State shall be brought in the Circuit Court of the county in which the seat of government is situated,” is easily reconcilable with that making it the duty of “each attorney for the State,” to “defend all suits brought against the State, or any county in his circuit,” (Dig., p. 191, sec. 2,) by the provisions of the revenue laws touching actions “deemed local at common law,” (Dig.,p. 796, sec. 7,) and also by some of the provisions of the escheat law, (Dig. 482, sec. 25,26.) Beyond these apparent conflicts, we have observed no want of harmony in the various provisions of the several statutes touching this subject in chapters 20, 21, 41, 64, 126, and 127. That the legislature designed by the various provisions of these enactme^k, and by others touching the law of costs, to perform the duty directed by the provision of the constitution in question, is to be gathered no less from the subject matter of these provisions, than by the language used. It is insisted, however, that, in ascertaining what the legislature did provide in this connection, a strict construction should prevail, and that nothing should be intended in favor of the citizen’s right to sue the State that is not within the express and explicit letter of the statute. No authority is produced for this except a case decided by the Supreme Court of Texas, (1 Texas R., p. 769,) where the court remarks “that no State can be sued in her own courts without her consent, and then only in the manner indicated by that consent;” but no authority is cited or reason given, nor does it appear that the remark was made in reference to any question of construction, but simply to assert a general doctrine of the law, which would certainly be true if consent was given and a “manner” of proceedingfixed, and all others excluded. But upon a question whether more than one manner was provided, it could have no application, except by asserting, by implication, a rule of strict construction at the same time that it concedes the right of the government to fix more “manners” of proceeding than one. Nor has any good reason been elsewhere assigned, so far as our researches have extended, why a rule of strict construction should govern a question like this. We have seen that it is not inconsistent with the usages even of despotic governments for a subject to sue his sovereign in his own court of justice, and that this light in the subject was unqualified in the English government until the usurpation of the feudal Kings, and was afterwards always allowed in a qualified form. And that by our constitution it is affirmatively directed to9 be provided for by legislative enactment, and not silently transferred within the sphere of their discretion like many other matters without any notice. And it is known^&^e have elsewhere said, (Carnall v. Crawford, Co. 6 Eng. 621,) that it was one of the objects of Magna Cha^^^^^^K the right of Englishmen to apply to the courts of jusT^UPthe redress of grievances upon the footing of fundamental absolute rights, and this has certainly never been lost sight of in American institutions, but always kept plainly in view. The right of a citizen to sue a State, then is not derogatory to common right, or subversive of the true principles of the common law, but is clearly in harmony with both, and it cannot be supposed that the people, in convention, in directing that the Legislature should provide in what courts and in what manner suits may be commenced against the State, intended that these provisions should be any other than such as would advance this right in the citizen to “apply to the courts of justice for the redress of grievances.” The spirit of the law then would rather demand a liberal than a strict construction. At any rate, we can perceive no valid reason, either intrinsic or extrinsic, why we should interpret these acts of the Legislature as we would a criminal statute that had created a new crime, or misdemeanor, or a civil one that had taken from a citizen a common lawB right. With these observations, we now proceed to the construction^ If we restrict the right of the citizen to sue the State, to what are technically actions at law and exclude chanceryproceedings, and then restrict these actions at law, still further, to the recovery of money demands, excluding the recovery of property, and then further restrict these particular actions to judgment merely, these various incongruities will appear in the law both intrinsic and extrinsic. 1. As to phraseology — “suits” is the word used in the constitution, and that word is defined in the Mirror to be “the lawful demand of one’s right” — a definition that is amply broad to include every proceeding instituted in a court of law or chancery. The title of chapter 157 of the statute is, “suits by and against the State.” In the third section of the same act are the words “all suits against the State.” And in the second section of chapter 20, it is made the duty of the respective prosecutma-attorneys to “defend all suits brought against the State.” ^j^^HÉksuit,” then, wherever it occurs, would have to be narm^^^^^^Bean-ing to actions at lawi 2. As to proceeding no further than to judgment. The same section (Dig., p. 962, sec. 5) that would restrict proceedings against the State to no progress beyond a final judgment, would seem to place the same restriction upon proceedings in favor of the State. The words of the act are “all suits by or against the State,” &c. Besides the provisions of the next section, which directs the Auditor to transmit “to the General Assembly a copy of such judgment and the proceedings thereon,” could have no effect so far as proceedings thereon are concerned, because that would be the end of the proceedings. And the act (Dig., 193 ,sec. 4) making it the duty of the clerk of the Pulaski Circuit Court to keep a judgment docket for judgments by and against the State, cannot supply this defect even if that could be regarded as a proceeding on the judgment, because that was passed in the year 1843. 3. As to the restricting the proceedings to such demands only as would be recoverable by an action at law: Even if it could be supposed that the convention and the Legislature had no eye to the security of the right of the citizen, and had only regard to the motive which seems to have induced the passage of the statute 8 Edward I, on the same subject, as disclosed by its preamble, to wit: “whereas the business of Parliament is interrupted by a multitude of petitions which might be redressed by the chancellor and the justices,” that motive itself would seem to have been sufficient to have prevented a discrimination such as the supposed one: for surely there would be in general less interruption to legislation by the examination of the grounds of a claim recoverable at law than one founded upon accident or mistake or other subject of equitable cognizance. And when the design to secure justice to the citizen is admitted as a concurrent motive, the improbability of any such designed discrimination is greatly enhanced: for surely the right of the citizen worthy of regard in case of equitable as in a case of legal cognizance. 4. As to restricting the proceedings to money demands at least, excluding demands for property : This, more than either restriction, has less of reason for its basis, whether the interest of the State or that of the citizen is considered. Because a provision of law for a suit for property against the State co nomine is at best much more matter of form than matter of substance, and the consideration of this point will develop how little the question we are considering deserved the prominence that has been given to it, and the gravity with which we have considered it. The most that such a provision can effect is to settle a question of title touching property between a citizen and the State by one suit instead of two. If such a proceeding was not authorized, the citizen claiming title to property held by the State would take proceedings against any officer of the government in the possession or occupancy of the property, and would recover it on the strength of his own title shown. If the State had in fact paramount title, she would be chiven to an after suit to regain it, not having thought proper to make her title available to her in the first action by way of defeating it. If in fact she had no paramount title, then no wrong is done her by the citizen’s recovery in this indirect way. The case of Wilcox v. Jackson, 13 Peters R. 498, is a case of this class, where ejectment was sustained against the commander of a military post. The interests of the State, when she chooses to assert them in such a case under the name of the party to the record, are as well defended as if she was in fact a party herself. Where the right is in the plaintiff, and the possession in the defendant, the inquiry cannot be stopped merely by the assertion of title in the Statel But the court will proceed to investigate the assertion and examine the title, and if the pretensions of the plaintiff are well founded, and those set up under the State are not, the plaintiff must recover the thing he sues for, and no wrong is done the Statel If it was true that the court could not adjudicate between private parties upon any subject matter when the pecuniary interests of the State might be injuriously affected, because the sSfc herself could not be sued without her consent, then no suit could be maintained by a non-resident against a citizen for the recovery of personal property because the removal of it might affect her revenues. So far from this, it is no objection if the State be the sole party in interest, and the contest be in fact one between the plaintiff and the State in truth and fact, although but nominally between the plaintiff and the defendant. The cases of Osborn vs. The Bank of the United States, (9 Wheat. 738,) and The Michigan State Bank vs. Hastings, (1 Douglass Mich. R. 225,) are of this kind, and there are other cases which go to the fullest extent in establishing this doctrinel It will be seen then, that, so far from such a restriction militating against the interest of the State, those interests will be promoted at least to the extent of preventing any temporary deprivation of the possession of property that she might hold by good title in any case. But all these incongruities will disappear if the statute be construed to allow the State to be sued as well in chancery as at law and as well for property as for money demands, and then every provision of the various statutes touching the subject will be found sensible, effective, and in harmony. The process of summons is to be served upon the Auditor in the commencement of any suit against the State for several reasons ; and whether the suit be for property or money, some of these concur to make him the most appropriate officer in the entire government to whom the summons should be sent, as will at once appear when we contemplate his public functions. The statute (Dig.,p. 201, sec. 7) provides that he “shall be the general accountant of the State, and keep all public accounts, books, vouchers, documents, and all papers relating to the contracts of the State and its debts, revenues, and fiscal affairs, not required by law to be placed in some other office.” Thus, whether the suit be for property or money, the papers relating to the title or the contract in question would in general be in his office, and thus afford data for advice by him to the appropriate prosecuting attorney, (Dig. 191, sec. 2,) for the proper defence of the State! If the suit had been for property, and the plaintiff had recovered against the State, and had been awarded possession, then no less is it the duty of the Auditor to “transmit to the legislature a copy of the judgment and the proceedings thereon, (which in that case would be the award of possession,) that“an appropriation might be made to satisfy the judgment,” because such judgment would not be satisfied until the costs adjudged against the State had'been paid, and this could only be done by an appi’opriation by the legislature, because of the provision of the statute exempting all property of the State, real and personal, from sale by execution. Dig. 278, sec. 15. And besides, by this means, the legislature would be obviously advised that property had been recovered from the State; and would also have data for investigation into the official conduct of the prosecuting attorneys touching the conduct of such suit. Adopting, then, the more liberal construction of the statute that make it effective and harmonious in all its provisions and phrases, and which carries out fully the manifest design of the constitution, which, as we have said, was to advance the right of the citizen to resort to the courts of justice for the redress of grievances, we are of opinion that this objection raised on the part State cannot be sustained: on the contrary, the State was properly made a party. This brings us to the consideration of the merits of this cause, which has rightly been considered by counsel as an important one. Not important, however, on account of the magnitude of the sum involved; for that, as was justly observed by Spencer Roane, in the case of The Commonwealth v. Beaumarchais, (3 Call. R. 145,) “is but a secondary consideration with any just government, and no consideration at all with any upright judge,” but because that certain important principles of law are involved, and that in their discussion the honor and justice of the State have been in some sort implicated. It is insisted with earnestness that the liquidation acts of our legislature are unconstitutional; and are unjust and iniquitous in operating to make the State a preferred creditor of the Bank. We must necessarily examine the first ground of objection, and whether or not the second will be responded to at all will depend, in a great measure, upon the result of such examination. Certain principles, which seem to govern this question and elucidate it satisfactorily, are as well settled perhaps as any in the law. A law in force when a contract is made, cannot by its legitimate operation impair its obligation in the sense of the constitution of the United States, for the reason that the existing laws are to be regarded as entering into, and forming a part of any contract or stipulations between the parties. (Blanchard v. Russell, 13 Mass. R. 16.) And it was upon this foundation that the Supreme Court of the United States, in the case of Ogden v'. Sanders, (12 Wheat. 213,) held that a bankrupt or insolvent law of any State, which discharges both the person of the debtor and his future acquisitions of property, was not a law impairing the obligation of a contract, so far as it respects debts contracted subsequent to the passage of such law. And this doctrine is elsewhere recognized find is perhaps no where seriously contested. It is also equally well settled that when an act of incorporation is a grant of political power, where it creates a civil institution to be employed in the administration of the government, or where the whole funds of the institution are public funds, the charter is completely within legislative control. (4 Wheat. 518.) Such corporations are created by the mere will of the legislature, and are in no way the result of contract; while those, however, through which the legislature seeks to accomplish some public purpose, by the instrumentality of a second party, who is to advance some money, labor or property, are the fruit and direct result of contract. The one is within the control of the legislature, as we have said, while the other cannot be dissolved, under the provision of the Federal constitution, otherwise than in pursuance of a power to do so reserved by the Stare to be exercised upon the happening of some contingency, and is therefore one of the stipulations of the contract out of which the incorporation sprung. Thus, it will appear that much of the mystery that labor and learning have thrown about a dry point of law so plain, is the result of the ordinary division of corporations into public and private, instead of corporations that are either such as are independent of all contracts that respect property, or some object of value, or which confer rights which may be asserted in a court of justice, and such as are the fruit and direct result of such a contract. And this will the more plainly appear, when we consider that all constitutional corporations are, in some sense, public, as they must be designed to effect some public good, as con-tradistinguished from private advantage, otherwise they would be monopolies, that are declared in the Bill of Rights to be “contrary to the genius of a Republic.” (See Miller v. Williams, 11 Iredell R. 511.) That the State Bank of Arkansas was of the class of corporations that are within the legislative control, has never been seriously contested. And that it cannot be otherwise considered, will abundantly appear by the consideration that, as an institution to be employed in the administration of the Government, its funds were exclusively public funds; and its creation was in no way the fruit and result of a contract, there having been no second party whose concurrent act with the legislature was to give it life and being. This power over the entire charter necessarily embraced a like power over each one of its provisions as fully as the whole together, and authorized the legislature to take from the institution any power or capacity that had been conferred, whenever, in the exercise of their constitutional discretion, the public exigencies would seem to require such diminution. And previous to the 11th January, A. D. 1843, when the legislature repealed the common law as to the effect of the expiration of a corporation, either by its own limitation, judgment of forfeiture, or by legislative enactment, and made other provisions of law in their stead, (Dig.,p. 278, ch. 39, sec. 16,) had the legislature exerted this undoubted power of repeal, and dissolved the charter of .he State Bank without making any further provision, which they had the power to withhold, all its real estate that remained in the corporation up to the moment of its expiration, would have reverted back to the original grantor, or his heirs, (see Angell & Ames on Cor., ch. 5, sec. 2, 3d edition, p. 159, and the numerous authorities there cited,) the personal property would have vested in the State, or the people, (ib.p. 160); and the debts due to and from the Bank would have been extinguished, (ib.p. 160, and authorities there cited, and the case of The State Bank v. The State, 1 Blackf. R.,p. 283, 284,) where this point is examined on principle, as well as tested by authority, and Fox v. Herch, 1 N. C. Eq. R. 559, Gaston Judge, delivering the opinion of the court. And in that case the holder of one of the bills of the State Bank would have had no remedy save only that which sprung out of his direct contract with the State, resting upon the 28th section of the Bank charter, whereby the State contracted with the bill-holder that the bills and notes of the Bank should be received in payment of all debts due to the State of Arkansas. And yet the bill-holder could not have complained that his contract with the Bank for the payment of the bill (whether in that contract with the Bank it had been either stipulated or not that his bill should be paid first and in preference to any other debt due by the Bank,) had been in the slightest degree impaired within the meaning of the constitution of the United States; because all these laws that we have referred to were in existence and in full .force at the time he made his contract with the Bank, and entered into and were part and parcel of the very contract and stipulation between him and the Bank for the payment of the bank bill on the part of the Bank. Every party contracting with a corporation being presumed by law to understand the nature and incidents of such a body politic, its liability to dissolution, and the consequences of such dissolution, the power of the legislature over its life and constitution and the legitimate sphere of the operation of the constitutional provision for the integrity of contracts; and is presumed to contract in reference to all those contingencies and regulations. (Angell & Ames on Cor., p. 160, and authorities there cited.) If this were not so in reference to rights that had not become vested by inhering in things, the absurdity would result that the mere creature was greater than its creator, the stream higher than the fountain, and the disastrous consequences upon the State Governments would be incalculable, in rendering immutable many civil institutions that might be set on foot for purposes of its internal government, and which, to subserve those purposes, ought to vary with varying circumstances. Accordingly, Judge Story remarks, in the case Mumma v. The Potomac Co., (8 Peters at p. 287,) that “It would be a new doctrine in the law that the existence of a private contract of a corporation should force upon it a perpetuity of existence contrary to public policy and the nature and objects of its charter.” And this principle is alike applicable to the repeal of corporations which are the fruit and direct result of contract, when the power of repeal is expressly reserved to the legislature; and in neither case will the courts presume that the power of repeal has been improperly or unconscientiously exercised by the legislature. (McLaren v. Pennington, 1 Paige Ch. R. 109.) Nor would tbe case be varied in principle if the note-holder’s contract with the Bank for its payment was of a date subsequent to the change of the common law as to the consequences of the dissolution of the charter of the Bank, otherwise than as that statute varied this law, and to this extent varied his actual contract with the Bank. In neither case, then, could his contract have been impaired by an absolute repeal of the charter of the Bank, although, in the one case, his debt against the Bank would have been extinguished, and in the other, under the provisions of the statute, his rights, although preserved, would have been in abeyance until the action of the legislature should be had thereon, unless some provision otherwise was made by the legislative act of dissolution. (Dig.,p. 278, sec. 16.) This being the legitimate result as to the question of constitutionality, had the Legislature dissolved the charter of the Bank, instead of placing it in liquidation as it did, it cannot be any the less the result of those acts of liquidation unless a mathematical absurdity could be admitted that apart is not included within the whole. Because the true nature and character of these acts are of the caste of true acts of dissolution, and as such are clearly embraced within the power to destroy the Bank, which we have seen was within the legitimate discretion of the Legislature — in fact, are but the result of the exercise by that body of those very powers of destruction in a modified form and to a limited extent. And this is plainly enough to be seen in the intrinsic character of the various provisions of the liquidation acts in which it manifestly appears that, in the judgment of the Legislature, the bank had failed to accomplish the public purposes and ends in their view at its creation, and had ceased to be a safe custodian and depository of the public funds; and in this condition was a rightful subject of dissolution at their hands. And thus these acts of the Legislature declare their own true source and character, and present themselves as legitimate instruments for the constitutional power of the Legislature over the life and constitution of the bank. And in thus exhibiting the judgment of tbo Legislature upon the exigency of the bank’s short comings and condition at the time when it was put in liquidation, and the true nature of the powers thereby exercised in the acts placing it in liquidation, all foundation is taken away for any argument that could be based upon the ground that, although the Legislature had the clear right to destroy the bank by a dissolution of its corporate character, they could not, constitutionally and by any and every capricious, arbitrary and unconscionable intermediate act, impair the obligation of the bank to a bill-holder. And, besides this consideration, we have already seen that the courts will never presume thatthe legislature has improperly and unconscientiously exerted such a power. And even if this was not so, in the case before us there is no possibility of any such presumption as to the acts in question; because the allegations of the complainant’s bill abundantly show that the bank had failed to accomplish the public purposes in view at its creation before these acts were passed. In the light of these views then, we hesitate not to declare it as our opinion that the Liquidation acts in question are all constitutional. These acts then being laws of the land, they must have force and sway in their legitimate scope without regard to their effect upon what would have been otherwise the complainant’s rights under the general laws of the land. Because, as to his rights in the premises, as we have seen when considering the constitutional question, there was no defect of legislative power from constitutional limitations and restrictions upon it: and consequently they can only be claimed and meted out by the measure of the liquidation laws, in which we include all acts of the legislature touching the assets of the Bank that have passed since the day when that body, for public purposes and with public ends in view, legitimately placed that institution in liquidation. The effect of these liquidation laws upon all the rights of the complainant founded upon the general law, as we shall more fully see in the sequel, being inevitably to place all such rights in abeyance at the legislative will to the extent that they may come in conflict with these paramount laws. A state of being for these rights contracted for by the complainant in his execu-tory contract with the Bank. Because the power of the legislature over the life and constitution of the Bank, and all that was embraced in that power was then the law and in force, and as such formed a part of this very contract or stipulation between the complainant and the Bank. And by this means the complainant, as to rights springing from this contract, and to this extent, voluntarily disrobed himself of what would have been otherwise his constitutional guaranties, by a like process as that by which a party voluntarily dispoils himself of such guaranties when he contracts for a summary judgment against himself. And although the public policy of a country may, and perhaps does, set some bounds to such relinquishments of private rights, none such are animadverted upon or held for nought by the law that falls short of a direct conflict with some known public policy : and in this case, so far from there being any such conflict, the voluntary conflict in question is in direct harmony and in furtherance of the policy of the State in the premises. And in determining the true interpretation and legal effect of these various enactments, we are not to limit our examination to the provisions of those simply which are stated in the complainant’s bill: but it is our province, in search of the law — facts being in general the proper subject of pleading — to go far beyond this and consider together all the enactments touching in any way the same subject matter, and also such uncontradicted history and public documents of the times of these several enactments that may shed light upon their various provisions. Conway Ex parte, 4 Ark., p. 367, 368. Warner v. Brees, 23 Wend., pages 134, 135, 136, 140. And in these lights it may be remarked in reference to the origin or foundation of these enactments, that a civil institution with large money capital furnished by the State, and important powers for good or for evil, employed in the administration of the State government, and in that capacity entrusted with all the public funds, had abused its trust and signally failed to achieve the public ends in view at its creation. And yet its operations bad been such that the pecuniary interest of the great mass of the citizens of the State had become so blended with that of the State and both were so much identified with the fate of this institution, that its continued existence with its then powers and capacities, or its sudden destruction, would be alike disastrous to both! Thus an emergency arose which demanded conservative action on the part of the Legislaiure, looking both to the interest of the State and to that of the citizen, which stamps these laws, in an eminent degree, with the character of remedial laws, and authorizes that construction of them which shall be most consonant to their reason and spirit, and will best suppress the mischief and advance the remedy. At the same session of the Legislature at which the first liquidation act became a law, another act of a general and permanent character also became a law, which provides that when “any corporation shall expire or cease to exist, either by its own limitation, judicial judgment of forfeiture or by legislative act, the common law in relation to corporations shall not be in force in relation thereto, but the goods and chattels, lands, tenements and hereditaments, and every right or profit issuing out of or appertaining thereto, moneys, credits and effects of such corporation shall immediately vest in the State, in trust for the uses and purposes by said charter contemplated; and each and every and all right, upon the expiration or dissolution of said corporation shall bo and is in abeyance until the action of the Legislature shall be had thereon unless provision shall be made by law for the management of said corporation fund in contemplation of such dissolution.” (Dig., Ch. 39, § 16, p. 278, 279.) This statute indicates, as the result of legislative wisdom, a permanent general policy for the State in reference to the civil death of corporations, having, among others, two leading features, that is to say, on such dissolution all rights which were of it, and in its favor, in its life shall vest in the State in trust, and all rights against it shall be in abeyance at the legislative will unless special provision of law be made to the contrary. And thus excluding all coercive measure against the State in her capacity of trustee for the purposes contemplated by the charter of the dissolved corporation. And this general policy, so set on foot, lays a reasonable foundation for the construction of laws by. analogy, which have for their manifest object the preservation and equitable distribution of the assets of such institutions when placed by law in a state of liquidation, and persuasively urges that such laws should be so construed as to advance this policy. And by a state of liquidation we understand that intermediate condition of a corporation over whose life and constitution the Legislature has power in which it is placed by law in being shorn of its powers and capacities to progress as originally, designed, but left with all its powers and capacities to retrograde and close up its affairs. And especially would this analogous rule of construction seem reasonable when it was manifest that the Legislature had been superinduced to force such an institution into liquidation upon conservative considerations, because of exigencies that had arisen from the abuse of powers and trusts on the part of such corporation to the injury of the public, and that its pecuniary affairs were thereby in an insolvent condition. For in no other way than by allowing affective energy to such laws for the preservation and equitable distribution of the assets could the conservative interposition of the Legislature be advanced, although at the expense of a corresponding abatement of a right to proceed against such assets, founded upon the general law.. And especially would such a rule be not unreasonable against one whose rights lived alone in the grace of the Legislature. In the various acts of the legislative, and public documents to which we have seen it is our province to look for a true interpretion of the law as applicable to the case before us, we learn that the Bank capital was derived from two sources, to wit: from the sale of 1,169 bonds, executed by the State to the Bank to be sold for money to constitute its permanent capital: and 2d, from certain specific funds which were for the most part trust funds in the hands of the State, and which, by the 13th section of the Bank charter, were to be “deposited in the principal Bank and constitute a part of the capital thereof;” but providing that the dividends declared by the Bank should be pro rata carried to the credit of each of such specific funds respectively; although the aggregate of all dividends should be subject to the control and disposal of the Legislature, and providing as to a portion of these specific funds, to wit: the seminary and school funds, that they might be at any time withdrawn — both principal and interest — without any action on the part of the Legislature. As all these specific funds were liable to be called for by the objects for which they were created, they could not reasonably be considered as a part of the permanent capital of the Bank in the same sense that the funds arising from the sale of the State bonds might be so considered; because to place them upon such a footing would pre-suppose a breach of trust on the part of the State, which cannot be presumed. From like sources we learn that the Legislature has always regarded the Bank as being in an insolvent condition from the time that it was put in liquidation; although its condition might then have been regarded by them as more sound than it has been since shown to be by various public documents. By the act of 31st January, 1843, (Sess. Acts, p. 77,) by which the bank was shorn of its power to issue notes in discount of any check, promissory note, bill, bond or other obligation, or to loan money in any manner whatsoever, and all its affairs were placed in the hands of a board of managers, any vacancy in whose office in the recess of the legislature to be filed by the chancellor of the district, and abolishing its offices of president, cashier, clerk, teller and directors, and making various provisions of liquidation, it was among other things provided that no person indebted to the Rank should be subject to be garnisheed for the satisfaction of any debt, demand or judgment against that institution in favor of any individual, company or corporation whatever; (ib. p. 86, sec. 30,) and at the same time provision was made for the security and collection of all debts due the Bank and for the equitable distribution of their proceeds among various classes of creditors. Al the next session, by act passed the 10th January, 1845, (Sess. Acts, p. 90,) $16,000 were appropriated out of the State Treasury to pay the salaries of the officers of the State Bank, “as other officers of the State,” and to pay judgments that had begn then or might thereafter be obtained against the Bank. 'And $200 were in like manner appropriated to pay an individual for services rendered in the collection of debts due the Bank, (lb., p. 132.) And so much of the thirteenth section of the Bank charter was repealed which directed, as we have seen, that certain specific funds in the custody of the State should constitute apart of its capital. (Session Acts,p. 95, sec. 19,) and these funds declared subject to appropriation by the Legislature. And certain par funds, then on hand, in the Bank, and other such to be received, were directed to be paid into the Treasury to the credit of the Bank on account of the surplus revenue fund. And the Financial Receiver at Little Rock was authorized and required, if practicable, to exchange any notes of the Real Estate Bank and branches then on hand or to come-on hand for State bonds sold by the State Bank, and providing for the cancellation of any such bonds so taken in. At the next succeeding session, judgments against the Bank were authorized to be paid off with judgments in her favor or with notes of that class where the right of renewal had been forfeited, but upon cei’tain conditions only; and among others, that a judgment creditor of the Bank should convey to the State by “fee simple deed” any real estate or other valuable property that he had theretofore caused to be sold by virtue of any judgment against the Bank, or so much of such as would be of equal amount to that so paid him. (Sess. Acts,p. 113, 114.) And by another act of the same session, (ib. 123, 124,) it was provided “that hereafter the title to all real estate and property of every kind purchased by the Bank or taken in payment of debts due said institution, shall vest in the State of Arkansas, and the title for real estate so taken shall be taken in the name of the State of Arkansas.” And there was a further provision that the governor should be authorized to exchange any property so taken by the Bank for an equal amount of bonds of the State executed for the benefit of the Bank, the value to be estimated at the price allowed by the Bank. And by an act passed the 11th January, 1851, all such lands on hand are directed to be sold by the State Land Agent. And by an act passed the 9th January, 1849, {Sess. Acts, p. 73,) all State bonds on hand in the State Bank, taken in payment of debts due this institution, which were originally sold by the Real Estate Bank to realize her capital are directed to be exchanged for such bonds originally sold by the State Bank, or the coupons of such, and all such State bonds or coupons so received by exchange are directed to be cancelled. And further providing, that the State Bank shall not thereafter be ruled to give security for the costs of suit, but that the State shall be liable for all judgments for costs against the Bank. (Ib. 73.) - And there are two other acts of the same session by which money is appropriated from the Treasury to redeem lands that had been previously sold by judgment creditors of the Bank. (Sess. Acts of 1849, pages 183, 184 and 204.) There are various other provisions, of some of these several acts, which, although we have considered them, we do not deem it necessary particularly to specify: from all of which, however, when considered together, it seems to have been manifestly the intention of the Legislature, from the day when the Bank was put in liquidation, to preserve the assets from waste while in process of closing up its affairs, and to distribute the same upon some scale approximating to an equitable one among all parties interested; and that the whole process of closing up and of distribution should be within its own discretion. That the legislature had the constitutional right to assume this attitude towards the Bank and all having dealings with it, we have already seen, and the only question is, whether or not they have actually so regulated and disposed of the assets of the Bank as to place them beyond the reach of the complainant by judicial process; and it is to determine this question that we have been examining all these various enactments of the legislature, and public documents, to arrive at their true meaning. We have seen then what were the leading objects of the legislature as to the assets of the Bank, to wit: their equitable distribution upon a scale to be fixed by themselves and their preservation from waste; and we have also seen, in the source and object of these liquidation acts, that they were in an eminent degree remedial laws. How, then, shall that provision be construed, which enacts that no person indebted to the Bank shall be subject to be garnisheed by any person having a claim or debt' against the Bank? Shall it be construed as simply cutting oif that statutory process? What was the mischief? If we were.to extend our examination no further than to the provision of that particular enactment in which this provision is, the 30th section, we should find abundant reason to doubt whether the construction should be so narrow; because in these we find a scale of priority fixed among the creditors of the Bank which could be as well disturbed by a creditor’s bill as by process of garnishment; and the same remark may be made as to any advantage that it might be imaginedwas intended to be secured for the Bank debtor on account of the currency being at that time depreciated. When, however, we look beyond this statute and consider it in connexion with those subsequently passed, relating to the assets of the Bank, although we find this particular scale of priority abandoned, nevertheless we see in various enactments a steady and uniform purpose on the part of the legislature to control the outgoings, and apportion the avails of the Bank assets, as they themselves shall deem most equitable and just. A purpose that is directly in conflict with any right elsewhere to seize upon and appropriate such avails while in process of collection, and alike inhibits a creditor’s bill from such an office, as the less searching statutory process of garnishment. Then when the true mischief is considered, which was the insolvency of the Bank, the jeopardy of public faith and public credit, of public and trust funds and of private interests, all commingled and at hazard to an extent to call for the direct interposition of the sovereign, power in whose justice all must trust, and that power not only interposed, but in affording the remedy has signified a settled purpose to determine upon the outgoings of the. scanty avails of this wreck of capital and of credit, it would seem to be worse than sticking to the bark to admit of a construction of the provision in question, that will thwart this settled purpose. Not that a sovereign should not bo powerless before right, even before a right that exists only by his own grace, but that he should bo alike just to himself and to all, and especially alike just to those who confide to him their trusts. And the same course of observations apply to the paper of the Real Estate Bank, which the complainant seeks to make available. This has been turned by the legislature to the benefit of the bond-holders. The Financial Receiver is authorized and instructed to exchange it for bonds of the State sold by the State Bank, and these bonds, when so. taken in, are directed to be can-celled in the Executive Department of the State government. And by a like process the bonds sold by the Real Estate Bank that may have been taken in by the Financial Receiver, are to be exchanged for bonds sold by the State Bank, and these in like manner cancelled And by act approved the 23d December, 1846, the lands were brought within the same rule of exemption by affirmative legislative action in relation to them like that legislative action ip relation to the debts due the Bank, and the Real Estate Bank paper, and the Real Estate State bonds, which we have just considered; and this was required no less to sustain the general purpose for the legislative distribution of the avails of the assets of the Bank, than to prevent their waste in the sacrifice of lands at execution sales, that had so frequently occurred, as we learn from the face of several of the acts of liquidation! And thus all the assets of the Bank are placed by law beyond the reach of judicial process at the suit of the complainant, as to whom as we have seen in examining the constitutional ques - lion, the power of the legislature so to place them was clear. But it is insisted that nevertheless, all this is as but cob-web before the chancellor, because of alleged fraudulent combination between the Bank and the State to hinder and delay creditors, since fraud vitiates every thing and holds fraudulent things as no things. If such acts and regulations be fraudulent, it is because the law makes them so; and these are the acts and regulations of the law itself, enacted by the power that made the law of fraud, and can therefore with equal power unmake that law as to these acts and regulations. But althoug denied relief by law as to the Bank, why not be allowed it as against the State, who according to the law, as just declared, may be sued in chancery, as well as at law? This is but raising the constitutional question again in a new form, and is easily answered; because the State having interposed not in her corporate, but in her sovereign, capacity, by the terms of the very contract on which the complainant would seek relief as against this defendant, all his rights live but in grace, and his remedies exist in entreaty only. The chancellor’s arm is therefore powerless for his aid, unless he could exhibit on his part the guarantees of the constitution, of which, as we have seen, he has voluntarily disrobed himself as against the State, in the capacity in which she is a party to this transaction. Upon the whole case, we consider there is no equity in the complainant’s bill, and therefore that the chancellor erred in overruling the demurrer interposed and rendering his decree. The decree must be reversed, and the cause remanded, with instructions to sustain the demurrer.