Pierrepont, J. (Dissenting.)
This ease presents but a single question. The intimate commercial relations existing between England and this country make that question one of much practical importance. The question is whether a citizen of New York residing in England, who accepts a bill of exchange payable there, drawn upon him by a merchant of New York, and after such acceptance obtains a discharge in English bankruptcy, of which the holder of the bill had no notice, can, on his return to New York, plead such discharge in bar of a suit brought,by the New York holder" of the bill.
Four years after the United States had achieved their independence, Lord Thurlow was told that in America the interest of the assignees, under the English bankrupt law was not regarded, and he observed with surprise that “ he had no idea of any country refusing to take notice of the rights of the assignees under their laws, and he believed every country on earth would do it besides.” (Ex parte Blake, 1 Cox, 398.)
Lord Hardwick, (in Pipon v. Pipon, Amb. R., 25; Thomas v. Watkins, 2 Ves., 35;) Lord Mansfield, (in Balentine v. Golding, 1 Cook’s Bankrupt Laws, 487; Wadham v. Marlows, 1 H. Bl., 437, note; 8 East., 314;) Lord Camden, (in Jollet v. Deponthieu, 1 H. Bl., 132, note;) Lord Kenton, (in Hunter v. Potts, 4 Term. R., 182;) Lord Ch. Clifford, (in Neal v. Cottingham, 1 H. Bl., 132, note;) Lord Thurlow, (in Ex parte Blake, 1 Cox, 398;) Lord Loughborough, (in Sill v. Worswick, 1 H. Bl., 665-691;) Lord Ellenborough, (in 5 East., 131;) and Lord Eldon, (in Selkrig v. Davis, 2 Dow., 230; 2 Rose, 292, in House of Lords, A. D. 1814;) all held that, as regards personal property, the lex domicilii, is to govern, and not the lex rei sitae; while each of them virtually, and some of them explicitly decided that an assignment in bankruptcy must be considered a voluntary assignment, and for valuable consideration, and that it conveyed the personal property to the assignees absolutely, and as against attaching creditors in foreign countries. And in the case of Sill v. Worsioich, Lord Loughborough observed, that it was a clear proposition, not only of the law of England but of every country in the world where law had the semblance of science, that personal property had no locality and was subject to the law which governs the person, both with respect to the disposition of it and to *468 the transmission of it, either by succession or the act of the party.
Following these high authorities, Chancellor Kent held, (in Holmes v. Remsen, 4 J. Ch. R., 460,) that a debtor in England owing a house in New York, as well as creditors in England, being declared a bankrupt in England, and his estate being duly assigned, that the English assignees took the bankrupt’s property wherever situated, and that me attaching creditor in New York acquired no rights in the bankrupt’s personal estate seized in New York subsequent to the bankruptcy. But this opinion of the Chancellor was soon after questioned in a suit at law between the same parties, (20 Johns. R., 254;) and within a few years after it became and has continued to be the settled law of this country that the lex loci rei sites prevails over the lex domicilii with regard to the rule of preferences in case of insolvents’ estates; and that the laws of other governments have no force beyond their own territorial limits, and can have no operation in other states except upon a principle of comity; and that no prior assignment in bankruptcy, under a foreign law, will be permitted to prevail against a subsequent attachment, by an American creditor, of the bankrupt’s effects found here. (Greenwood v. Curtis, 6 Mass. R., 378; Oliver v. Townes, 14 Martin’s R., 99; Milne v. Moreton, 6 Binney’s R., 353; Ingraham v. Geyer, 13 Mass. R., 146; Ogden v. Saunders, 12 Wheat., 213; Abraham v. Plestoro, 3 Wend. R., 538; Hoyt v. Thompson, 1 Seld., 340.)
It has long been settled that a discharge under a State law is no bar to a suit on a contract existing when the law was passed, nor to an action by a citizen of another State in the Courts of the United States, or of any other State than that where the discharge was obtained. The discharge under a State law will not discharge a debt due to a citizen of another State. (Sturges v. Crowninshield, 4 Wheat., 122; Ogden v. Saunders, 12 Wheat., 213; Cook v. Moffat, 5 How. U. S., 295; Braynard v. Marshall, 8 Pick., 194; Baker v. Wheaton, 5 Mass., 509; Savoye v. Marsh, 10 Metc., 594; Hoyt v. Thompson, 1 Seld., 340; Donnelly v. Corbett, 3 id., 500.)
In'the case of Donnelly v. Oorbett, reported in the 3d of Selden, Corbett, a resident of South Carolina, purchased goods of Donnelly in New York, and gave his note at eight months, payable at the Bank of South Carolina, in Charleston. The notes being *469 dishonored, the plaintiff brought suit in the Court of South Carolina and recovered judgment. Subsequently Corbett obtained a discharge from his debts under the insolvent laws of South Carolina.
The plaintiff afterwards commenced suit upon the judgment, in the Supreme Court of this State, and the defendant pleaded his dischargethe Court of Appeals held that the -discharge was no bar to the action, although the debtor had been discharged under the laws of South Carolina where he had always resided; the very place designated in the contract for its performance, and although the insolvent laws under which the discharge was obtained were in full force at, and long prior to, the date of the contract.
The precise question now before us was decided in 1851, by Chief Justice Shaw, of the Supreme Court of Massachusetts, in the case of May v. Breed, (7 Cush., 15,) giving full effect to the English discharge against a Massachusetts creditor. The well considered opinion of this very able and eminent Judge demands a careful and most respectful consideration.
The learned Judge adopting the language of another, says:
“ Thus if an American merchant becomes the creditor of an English merchant in England, and the English merchant becomes bankrupt and obtains a certificate of discharge, the American merchant will be concluded by such certificate, for it is reasonable to suppose that both parties knew of the existence of the bankrupt laws of England, and the contract must be presumed to have been made- with reference to those laws.”
The learned Judge (at p. 37) further says: “ The ground upon ■which the principle is placed, is this, that the law of the place of the contract, which may be called the law of the contract, gives it its character, makes it what it is, fixes its limits and obligations, fixes the time when it shall commence, how it shall be executed or satisfied, and how it shall be terminated and discharged; when, therefore, such contract is discharged by force of the same law which gave it its origin and effect, it is extinguished and no longer exists as a contract.”
This reasoning, though sound in general, seems not strictly applicable to the particular case under discussion.
The obligation of the English trader to pay the New York merchant his just debt, which, by accepting the draft, he pro *470 mises to pay, does not rest upon English statutes. Its origin is ancient as commerce, and existed long before the passage of the English bankrupt act. It is not, therefore, “ sought to be discharged by force of the same law which gave it its origin and effect.”
The theory seems to be, that a discharge in bankruptcy derives some part of its-efficacy, at least, from the contract of the parties.
An absolute discharge from an honest debt, without the creditor’s assent, is an act of high sovereignty, which overrides all contract, and proceeds against the creditor purely in invitum. The idea that it rests in any manner upon contract, in the language of Judge Gardiner,- “ scarcely deserves the credit of plausibility.” (Donnelly v. Corbett, 3 Seld., 500.)
There is no doubt that acceptances are deemed contracts in the country where they are made, and the payments are regulated by the laws thereof. But, in my judgment, the bankrupt acts of England in no possible, manner enter into the contract of acceptance of a foreign bill of exchange. Those laws have nothing whatever to do with the “ validity, nature, obligations or interpretation of such contract.” The acceptance may justly be considered as made with reference to the English law relating to bills of exchange; and, if the acceptance is invalid or void under the English law, it cannot be enforced here. But the original invalidity of the contract is a widely different thing from á discharge, (by mere force of a local statute,) of a just' and valid obligation.
In the language of Chief Justice Parker, “ We must' look beyond the law regulating the interpretation of a contract to find the grounds upon which it may be discharged.” (Blanchard v. Russell, 13 Mass., 1.)
We are to consider what effect is to be given to this act of foreign sovereignty, by which one of our own citizens is to be deprived of a debt admitted to be justly due.
Upon the principle of comity alone, we are asked to give full force to the discharge which is pleaded.
We have already seen that if the present defendant were a citizen of Kew Jersey, pleading a like discharge under the laws of that State, his defense would be of no validity. It is urged, however, that the Constitution of the United States interposes to deprive the citizen of Kew Jersey of such defense, while that instrument cannot operate to restrain the Parliament of Great *471 Britain from passing such bankrupt laws as they please; and that, by the comity of nations, our Courts must give full effect to the English bankrupt act, while they disregard similar laws of all the sister States; that though the framers of the Constitution of the American Union regarded such laws as so unjust that they forbid their passage by the different States, yet comity requires that our Courts shall give full force to. this foreign discharge, which, if obtained under the laws of New Jersey, would be totally disregarded. That is to say, the same defense, (which, if interposed by a merchant of Hoboken, we must reject,) is to operate with full power when pleaded by a trader of Venice or Vienna.
This leads us to a consideration .of what this comity is, which is invoked for such high ends, and to which Chief Justice Shaw, in the case above cited, gives all the efficacy which the defendant here claims.
It seems to reach something beyond the “ golden rule,” and requires us, out of courtesy, to respect those foreign laws as sacred, which, if made in our own confederacy, we deem to be unjust. It claims to shield the citizen who has become a bankrupt trader in London from the payment of his just debts, while it refuses any such protection to the same citizen when he has become a bankrupt trader in Charleston.
The learned Lord Chancellors, above cited, in alluding to the rights of assignees in bankruptcy, speak like Englishmen full of reverence for English laws; but whenever a debtor in England invokes the foreign law to relieve him from his debt, these same Judges invariably discriminate, and respect or disregard the foreign law according as they deem such law equitable or unjust; and although they assert that full force is given to an assignment in English bankruptcy, “ wherever justice prevails or law has the semblance of science,” yet Lord Ellenborough, in the case of Potter v. Brown, (5 East., 124,) cited by the defendant here, laid it down as a doctrine long settled, and, as he expresses it, “laid up among the acknowledged rules of jurisprudence,” that when foreign laws clash with the rights of British subjects, the foreign laws are to yield.
The recognition of foreign statute laws at all has never had any other basis than that of mere comity; and whether the cour *472 tesy should be extended or not, has uniformly, in England, been ■left to the discretion of the Judges as the cases arose.
One case, among many, will suffice to illustrate the English, rule upon this subject.
A Dane, named Wolff, became a trader in England, and was finally naturalized. Oxholm, a subject of the King óf Denmark, residing in Copenhagen, became indebted to Wolff in upwards of £2,100, to recover which, a suit was commenced in the Courts of Denmark against Oxholm. Pending the action, a war broke out between England and Denmark; and in September, 1807, the Danish government passed a law requiring all persons to render an account of all debts due English subjects, directing the same to be paid into the treasury of Denmark, and provided that in case any one concealed the debt, he should be proceeded against by the officers of the Exchequer.
As the case was in Court, there could be no concealment, and Oxholm was compelled to pay the debt, and did actually pay it into the treasury of Denmark in 1812. In 1814 Oxholm came to England, and was there arrested by the assignees of Wolff for this very debt. He pleaded compulsory payment under the laws of his own country. The cause was decided by Lord Ellenborough in 1818, and Oxholm was obliged to pay the money over again, which he had long before been compelled to pay by force of the laws of Denmark. (Wolff v. Oxholm, 6 Maul. & Selw., 92.)
Lord Ellenborough suggests a doubt whether' the law of Denmark was not in conflict with the law of nations. That the Danish law was in conformity with international law will be found as early as Yattel, (Vattel, lib. 2, ch. 18, §§ 342, 343, 344;) and as late as the case of Brown v. The United States, reported in the 8th of Cranch, (8 Cranch, 110.)
The defendant has cited two cases, one from the Maine Reports and the other from East’s Reports, which he claims are analogous. Examination will show them to be different. In the case of Very v. McHenry, (29 Maine, 212,) the plaintiff went to New Brunswick, and there performed labor; which was the foundation of the claim. The defendant was discharged in New Brunswick, and the Court in Maine gave effect to the discharge.
*473 In Patter v. Brown, (5 East., 129,) a merchant in Baltimore drew a bill upon another in England. The bill was protested for non-acceptance; the drawer was discharged under the American bankrupt act of 1799, and the discharge was held to be a bar in England.
In deciding that case, Lord ELLENBOKOtrGH very justly observed: “We always import, together with their persons, the existing relations of foreigners, as between themselves, according to the laws of their own countries; except, indeed, whore those laws clash with the rights of our own subjects here.” This, in my .judgment, expresses the true doctrine, and will be found in conformity with the settled law both of England and America.
We recognize-the rights of foreign assignees under a voluntary assignment; though the Courts of New Jersey seem to have denied even that.
But we do not regard any statutory assignment as voluntary.
By comity, we permit English assignees in bankruptcy, and trustees under insolvent laws of the several States, to prosecute claims in our Courts, and to recover the property of the foreign insolvent, except where the rights of our own citizens are brought in competition, in which case the foreign claimant, under foreign laws, must yield. (Prentis v. Savage, 13 Mass., 20; Story’s Conf. Laws, § 348; Bank of Augusta v. Earle, 13 Peters, 520; Hoyt v. Thompson, 1 Seld., 340; Bard v. Poole, 2 Kern., 505; Penniman v. Meigs, 9 J. R., 325; Abraham v. Plestoro, 3 Wend., 539; Holmes v. Remsen, 20 J. R., 265.)
Let us see whether the relations between a drawer and holder of a bill in New York and the acceptor in London are altogether foreign, so that, when the acceptor comes to New York, we can be said to have “ imported, together with the person, all the existing relations.”
When a merchant in New York draws upon his banker in London, the theory is that the banker has the funds of the drawer; and when the banker accepts the draft, he admits that he has such funds.
A Liverpool merchant, through his agent here, purchases a thousand barrels of flour in New York, and ships it to England; nothing is said about the time of payment; the seller draws upon the buyer at three days’ sight; the bill is accepted, payable in London.
*474 An English traveler in America borrows a thousand dollars of his friend in Hew York, and gives no voucher. On his return to England, the friend in Hew York draws upon the returned traveler, who accepts the bill, payable in Liverpool. In each case, the acceptor is in England, and the contract of acceptance is made in England; but the debt arose in America. The obligation existed before' the acceptance; and in every case, (the contrary not appearing,) the acceptor admits that he owed to the drawer the amount of the bill accepted.
In the cases put, the original debt was contracted in America, and not in England; and in no case of acceptance of a foreign bill are we compelled to assume, without evidence, that the obligation which moved the acceptance originated in the country of the acceptor.
In these supposed cases, one of flour purchased and the other of money borrowed in America by a British subject, the acceptances go to protest, the debtor obtains a discharge in English bankruptcy, and returns to Hew York; and, in bar of suit brought, pleads such discharge. Are we called upon, by the comity of nations, to allow his plea? Are all the relations of debtor and creditor existing between the Englishman and the American, foreign ? And have we 11 imported all those relations ?” It is quite certain that the original obligation was not foreign 'and not imported; and (in judgment of law) there being no evidence to the contrary, an acceptor of a foreign bill admits, by his acceptance, an existing obligation due to the drawer.
I, at least, cannot assent to extend a higher courtesy towards the statutes of Austria or England than towards the laws of our sister States; and I am persuaded, after no little investigation, that the settled law of England, (notwithstanding some dicta of her Chancellors,) is now, and has long been, in harmony with these views.
I think the order overruling the demurrer should be reversed, with leave to the defendant to answer over in twenty days, upon payment of costs of the demurrer and of this appeal.
Judgment affirmed.[1]

 See Robinson’s Practice, vol. 1, p. 89, ch. xviii, Title, “Effect of discharge under insolvent or bankrupt law.” See, also, Smith v. Gardner, ante, p. 54.