# PROVIDENCE COUNTY.

GOODSELL, BUDILLON & CO. *vs.* ROBERT BENSON & CO. *et als.*

G., in Boston, dealing with J., in Naples, arranged to make payments as follows: G. procured two letters of credit on B. of London, one in favor of J. and the other in favor of himself, but assigned to J. J. was to send goods to G., was to draw on B. for payment, and with the drafts was to forward bills of lading drawn to B.'s order. B. was to accept the drafts and forward the bills of lading to L., his agent in Boston, who, on receiving from G. funds to meet the drafts and commissions, was to deliver the bills of lading to G., properly indorsed to him, G. agreeing, immediately on receipt of the goods, "to provide funds to meet the corresponding acceptances, commissions," &c.

In the course of business, and pursuant to this arrangement between G., J., and B., J. had drawn on B., and B. had accepted drafts to the amount of £3,900, when B., June 15, 1875, became bankrupt. These drafts were then held by purchasers for value and were taken up by J. B. was discharged in bankruptcy as of September 8, 1875. G. had paid to L. the sum of $22,314 to meet B.'s acceptances, and this sum had been, by L. and B., mingled with their other moneys. G. paid the account of J. for goods purchased.

L. had drawn on B. at times as B.'s agent and at times in his own name. L. became bankrupt in November, 1875, and his assignee was appointed in the District of Massachusetts under the United States Bankrupt Act.

July 27, 1876, G. brought an action against B. to recover the amount paid to L., and attached certain moneys on deposit in Rhode Island. These moneys were collected on a judgment recovered July 3, 1876, in favor of a former agent of B. who had, in November, 1874, agreed in writing that the moneys belonged to B., and had given L. an irrevocable power of attorney to collect them.

In equitable proceedings to determine the right to these moneys, which were claimed by the English assignee in bankruptcy of B., by the American assignee in bankruptcy of L., in virtue of an alleged equitable assignment of these moneys by B. to L. to cover L.'s liability for drafts drawn in his own name on B., and by G., in virtue of his attachment:

*Held*, that on the evidence adduced the moneys had not been equitably assigned by B. to L.

*Held*, further, that the transactions between G., B., and J. were essentially a remittance by G. of funds to B., to be forwarded by him to J.

*Held*, further, that the funds not having been so forwarded by B. to J., B. was liable to G. for them.

*Held*, further, that B.'s liability to G. was a debt payable in Boston.

*Held*, further, that this debt was not discharged by the bankruptcy proceedings in England.

*Held*, further, that the transfer of B.'s estate to his assignee in bankruptcy in England could not affect G.'s attachment in Rhode Island.

*Held*, further, that G. was entitled to recover his claim against B. out of the attached moneys, but that all dividends paid by B.'s estate, on J.'s drafts, should first be deducted from G.'s claim.

The conditions of an equitable assignment defined.

A money debt is payable at the creditor's domicil.

*Query*, whether decrees in bankruptcy have any extra-territorial effect except as to persons making themselves parties to the proceedings.

BILL IN EQUITY to establish a lien and for an account.

This case was heard upon bill, answers, proofs, and the following agreement signed by the solicitors of the litigating parties in interest:

" It is agreed that any sums which might be recovered in any suit at law by Goodsell, Budillon & Co., of Robert Benson & Co., may be recovered in this suit in equity. And that no question of equity jurisdiction is to be raised in this suit in equity. And the court is to determine therein the conflicting and adverse claims of the several parties claiming the fund in question and administer the remedy in equity."

The facts involved, as found by the Court, are stated in the opinion.

*February* 12, 1881. · POTTER, J.  This is a bill in equity in the nature of a bill of interpleader.  Story Eq. Pl. § 297; Story Eq. Jur. § 824.

Goodsell, Budillon & Co., a Boston firm, wishing to buy gloves of Joseph Budillon of Naples, Italy, in January, 1875, made this arrangement for payment.  They procured from Benson & Co. of London, through their agency in Boston, two letters of credit, one for said Joseph Budillon, the other to themselves, but assigned by them to said Joseph, for acceptance of drafts to be drawn by said Naples party on the London firm payable in London; and said Boston firm, the purchasers, agreed in a paper addressed to Benson & Co., Boston, in consideration thereof, immediately on receipt of the goods, *to provide* them with *funds* to meet the *corresponding acceptances*, commissions, &c.  The bills of lading were to be drawn to the order of Benson & Co.

Under this arrangement thirteen drafts were drawn amounting to £3,900 by the Naples vendor, all accepted by the London firm, were discounted and held by the Westminster Bank of London and others, and had not been paid when June 15, 1875, the London acceptors became bankrupt. They filed a petition in bankruptcy June 21st, and were subsequently discharged as of September 8, 1875. The holders presented said drafts in bankruptcy and received a dividend of twenty per cent., as appears from the agreed statement of facts in the case.

The bills of lading had been forwarded to the London firm with the drafts, and on acceptance had been sent to their agent in Boston, and by him delivered to the Boston purchasers, who had at the same time, as per agreement, provided the Boston firm with funds to meet the particular drafts. The purchasers in this way had paid to the London firm up to June 9th the sum of $22,314.21, for the purpose, as they claim, of being remitted to meet the different drafts, commissions, &c. These moneys so paid were by the London firm and their agent mingled with their other moneys, as they claim they had a right to do.

The Naples vendor has settled with the holders of the drafts, and the Boston purchasers have paid the Naples vendor for the goods bought.

The complainants have in a suit at law attached property of the London firm in this country, which property is claimed by one Kidder as assignee of Glyn, hereinafter named, by virtue of a prior equitable assignment. In order to properly understand this question a statement of other facts is necessary.

Frederick Abbot and P. Adams Ames were doing business in Boston under the firm name of Page, Richardson & Co., and had been the former Boston agents of the London firm. They had drawn drafts on the London firm in favor of the Providence Marine Railway Company, and had taken as security for the drafts the promissory notes of said Providence Marine Railway Company. On these notes Page, Richardson & Co., July 3, 1876, recovered a judgment for $14,672.86, and their solicitor, Mr. Bradley, collected it, and, deducting charge for services, &c., deposited $13,000 in the Rhode Island Hospital Trust Company, to be paid to whomsoever it should be decided to belong. Before

that, on November 7, 1874, Page, Richardson & Co. had signed an agreement that the moneys in controversy were the property of the London firm, and by the same instrument gave an irrevocable power of attorney to collect them, and delivered the power to Charles H. Glyn, then agent in Boston of the London firm.

Goodsell, Budillon & Co., the Boston purchasers and complainants in this bill, commenced a suit at law against the London firm in the courts of Rhode Island, and on July 27, 1876, served their writs on said Bradley and said Trust Company, in order to attach the money in their hands. They claim as creditors of the London firm and by virtue of their said attachment.

But these moneys are also claimed by Edwin Waterhouse, the English trustee or assignee in bankruptcy of Benson & Co., and also by Henry P. Kidder, the assignee in this country of Charles H. Glyn, who became bankrupt in November, 1875. Said assignee was appointed in the district of Massachusetts under the United States bankruptcy laws.

The complainants have brought this bill for themselves and all the creditors of Benson & Co. who may come in, and have made Benson & Co. and Waterhouse, Glyn, Kidder, Bradley, and the Trust Company, parties. All have appeared, and as the rights of the several claimants could not be well decided in the pending action at law, have agreed in writing that the court shall decide in the present suit to whom the money so attached belongs.

It is obvious that the claim of Kidder as assignee of Glyn must be first considered; as, if the property attached had been equitably assigned to Glyn, there was nothing belonging to Benson & Co. which could be attached.

Glyn, and his assignee in bankruptcy Kidder, claim by virtue of an alleged equitable assignment of this and other assets of Benson & Co. in this country, made by Benson & Co. to Glyn through R. J. Wigram, one of the partners of said firm, under the following circumstances:

After it became evident that the arrangement between the London firm and Page, Richardson & Co., would fall through, in consequence of the embarrassments of the latter, the London firm, in the fall of 1873, sent over Charles H. Glyn, not a partner, but a clerk in their employ, as their agent, to attend to their

affairs here. Subsequently, in the fall of 1874, Wigram, the partner before mentioned, came over and made a new arrangement by which Glyn was to draw upon the London firm and sell the bills and remit the funds to London. He gave Glyn a general power of attorney to collect, &c., dated December 31, 1874.

Glyn did draw upon them, sometimes in his own name and sometimes in the name of Benson & Co., which he says he was authorized by the power to do. According to Glyn's statement certain stocks, notes, and funds were placed in his hands as indemnity for the drafts drawn in his own name, and he contends that the claim to the moneys attached and now in controversy was among them. Glyn had drawn drafts upon Benson & Co. in London in his own name, to the amount of      , not paid at the time of the bankruptcy.

This makes it necessary to examine the other testimony in the case.

Mr. Wigram testifies there was no written agreement and no special agreement to secure Glyn for his personal liability. It was understood that the securities were to follow the drafts. He was to collect the funds and remit: "He had only the control which he would have as general agent," &c. ; he would have received the debt of the Marine Railway Company if collected, under his general power of attorney. The question of risk never arose. It was not supposed there was any risk. "I am not aware that the said claim has come into Glyn's possession, nor was it ever to the best of my recollection agreed to be assigned or transferred to him."

Mr. Fiske states that Glyn said the claim belonged to Benson & Co., and made no claim to it as his own. This was after the bankruptcy. Mr. Goodsell testifies that Glyn told him that he had no security, that the debt in question belonged to Benson & Co., that his salary was all he had, and that was in arrears. On the other hand Mr. R. H. Glyn, one of the partners in London, testifies that he understood that the claim against the Providence Marine Railway Company stood on all fours with the other securities.

It appears from all the testimony that certain stocks, notes, and securities were actually transferred and indorsed to Glyn,

but as to this debt he seems to have had no claim to it unless under the general power given him by Wigram. There was no express assignment to him. Nothing can be inferred from the alleged fact that the power from Page, Richardson & Co. was *placed* in his hands; it was already in his hands as Benson & Co.'s agent, and there is nothing to show that it was ever in his hands in any other sense, or that he ever claimed so, or gave any notice of it to the persons interested.

Now to constitute an equitable assignment there must be an intention to assign, a mutual assent or understanding that it is so. It need not be in writing; but it must be an appropriation of the money or property to the use of the assignee. His claim must be adverse to the assignor, and not merely as agent. A power of attorney may constitute an assignment if so expressed, or if proved from the accompanying circumstances that such is the intention. As between the assignor and assignee, these things may constitute an equitable assignment. 2 White & Tudor Lead. Cas. Eq. 4th Amer. ed. 1641, 1648, 1654; *Rodick* v. *Gandell*, 1 De G., M. & G. 763; *Casey* v. *Cavaroe*, 6 Otto, 467, 484; Leake Digest of Laws of Contracts, A. D. 1878, p. 1168.

Whether notice to the debtor be necessary or not to complete the assignment, at any rate the omission to give notice may be evidence, and strong evidence, as to how the assignee himself understood the transaction at the time it was made. *Rodick* v. *Gandell*, 1 De G., M. & G. 763, 780.

It would be good against foreign assignees in bankruptcy, as the assignee succeeds to the assignor's right and nothing more.

If the proceeds were to follow the drafts, it could only be done by collecting and remitting, and not by retaining the proceeds. It was his duty to remit as fast as collected. Besides the proceeds of these funds transferred to him, he was selling drafts and receiving proceeds, and the fact that he was constantly remitting without making any claim is entitled to weight. If he had any lien on the ground of agency, he could have retained funds; and so if he had collected the present debt under his power, he could retain if his principal owed him ; but if it was a mere power and not an equitable assignment, the power would have ceased on the bankruptcy of his principals in June, 1875. He himself did not

go into bankruptcy until November, and the judgment was not obtained until after the bankruptcy of both.

If there had been a special assignment of the power which Page, Richardson & Co. gave Benson & Co., or a special substitution under it, the claim of Glyn might have stood on stronger grounds, as these things might be evidence of intention.

It is argued, and very ably argued, by the counsel for Kidder, that these securities were first assigned to Benson & Co. by Page, Richardson & Co., their former agents, to secure Benson & Co. for drafts which Page, Richardson & Co. had drawn; and that as Glyn's drafts took their place and were used to retire Page, Richardson & Co.'s drafts, the security follows the debt whatever shape it may assume, and must therefore be applied to the bills drawn by Glyn.

Admitting the general rule we do not think it applies to the facts in this case.

Benson & Co. paid the Page, Richardson & Co. drafts themselves. If they paid them from their own funds, or from any funds which they had a right to mix with their own, there was an end to these drafts; and the notes, &c., for which the drafts had been sold, including this Providence Marine Railway Company debt, would be the absolute property of Benson & Co. They might indeed pledge them to Glyn, and so far as concerns the stocks, notes, &c., which were actually transferred to Glyn, there need be no question here.

If these bills, the counsel argue, do not represent and stand for the original indebtedness of Page, Richardson & Co. to Benson & Co., then nothing does. Undoubtedly so.

So far as Glyn's drafts were concerned, he, if faithful to his trust, sold them for cash and remitted the cash to London. If he sold for anything but cash, as it seems his predecessors had done, for the business as done by them seems to have been very similar to that of two traders swapping notes for the purpose of raising money on credit, it must have been by the consent or acquiescence of Benson & Co., and if he failed to retain enough of the stocks, &c., actually transferred to him, or of the proceeds of the drafts he sold, to secure him for his salary and risk, we can consider the amount due him from Benson & Co. over and above

these securities in no other light than a debt due from them unsecured.

Glyn had made no claim for it, had given no notice, had not collected it, nor made any effort to get possession of it; and it seems to us that upon the evidence as it stands, the debt must be considered as the property of Benson & Co. and liable to be attached as theirs, unless it passed to their assignee in bankruptcy, Waterhouse.

If the moneys attached do not belong to Glyn or his assignee by equitable assignment, then the question arises, Were the Boston firm of Goodsell, Budillon & Co. creditors of the London firm; and if so, is their attachment of the moneys good?

The counsel for Waterhouse, the assignee in bankruptcy of the London firm, very ingeniously contend that the London firm have made no contract with the Boston firm on which they are liable to them; that the banker could never contemplate rendering himself liable to both bill holders and the merchant at the same time, thus making himself liable to two persons to pay the same debt, and that there is no allegation in the bill of any separate contract. They further contend that the money remitted was not specifically appropriated; that it was not held by the London firm in any fiduciary capacity; that it was the common relation of debtor and creditor, and that the debt to the Boston firm, if any, was discharged by the bankruptcy.

While we are of opinion that the allegation of indebtedness to the Boston firm is sufficient, and even if it was imperfect, having been thoroughly argued, it would be mere matter for amendment, yet if they have made no such contract, there is no debt to be sued.

It is true the Boston firm were not parties to the drafts, at least their names did not appear upon them. So far as the discounters or holders of the drafts are concerned, their reliance was primarily upon the acceptors and next upon the drawers. The holders knew nothing of any other contract, and from this contract to accept and pay in London, the London firm were discharged by their bankruptcy, so far as the holders were concerned, and except as we shall state hereafter.

But the drafts were only a part of their contract. The Boston

firm had to pay money in Naples. They procure from the London firm by their Boston agent letters of credit, which are sent to the Naples vendor, who, in consequence, draws on the London firm for the price of goods sent. To secure the drafts and render them more easily negotiable, bills of lading are sent with the drafts to the London firm, who, according to agreement, accept them and forward the bills of lading to their Boston agent. The Boston purchasers pay the money as they had agreed, to be remitted to London to take up the drafts, and the bills of lading are given up.

If the Boston purchasers had simply bought and paid for a draft and sent it indorsed to Naples, and it had been refused acceptance or payment, the Boston parties on taking it up could look only to the drawer or prior parties, and would lose the money they had paid, unless they could recover it of them. That would be the mere relation of debtor and creditor. But it is not this case.

The transaction now in question was really a tripartite contract, and each was in privity with the other, and each had a pecuniary interest in the performance by the other. The Boston purchasers arranged to pay in the way we have mentioned, and the Naples vendor acted on the faith of it. But if that failed, they were still liable. Each was a party to this agreement. Stripping it of mere matters of form, it is the case of A. remitting money to B., to be by him forwarded, whether by cash, checks, or drafts is not material, to C. at Naples, the ultimate seat of the obligation. The other parts of the contract are the mere machinery for carrying it out.

In the case of *Carnegie* v. *Morrison*, 2 Met. 381, Bradford of Boston owed the plaintiffs in Gottenburg, and to pay them he procured of the Boston agent of a London firm a letter of credit addressed to the London firm for £3,000, and remitted this to the plaintiffs, who accordingly drew upon the London firm. Owing to the state of the times the draft was not accepted nor paid. Bradford failed, and the Gottenburg firm sued the London firm in Massachusetts. Bradford had agreed to cover the drafts at maturity by remittances to London. The Boston agent of the London firm knew that Bradford owed and wished to pay the

plaintiffs this amount on account. The court say, p. 400, the contract really is as if expressed thus : " Whereas John Bradford is indebted to the plaintiffs of Gottenburg in the sum of £3,000, and has requested us to pay them that amount for him by means of bills drawn on us at London," we, for value received, promise to accept and pay their bills to that amount. The promise, though in terms made to Bradford, was for the benefit of the plaintiffs. The London firm had agreed for value received to pay Bradford's debt to the plaintiffs, who accepted the agreement and were damnified by the breach of it; and the court held the plaintiffs had a right to sue. See the latter portion of this case criticised in 2 Amer. Lead. Cases, 5th ed. 350, on the ground that the plaintiffs had not paid nor done nor suffered anything on account of the letter of credit.

The present case is not exactly like this, but this shows that the court will look at the real nature of the contract. In both cases the contract was merely a mode of transmitting money from one place to another ; but the suit was brought by the persons to whom the money was to be remitted, instead of by Bradford, who was to send it.

So here the Boston firm remit money to the London firm to be applied to a certain debt. It is not so applied. The London firm then owe the money to the Boston firm, and an action for money had and received would lie for it. 1 Archbold Nisi Prius, *254. They knew the object of the contract, and were bound to carry it out. The Boston firm are damnified by the non-payment, as in the other case the plaintiffs were damnified by the non-acceptance and non-payment by the defendants, which their agent had for them agreed to.

In both cases the contract had been made in this country by the parties, through agents here, but was to be performed in London ; yet the court in that case held it a Massachusetts contract, and to be governed by the laws of Massachusetts ; and upon this point we have the opinion of Judge Story in a similar case except that the remittances had been on general account, where he mentions this decision and approves it. *Russell* v. *Wiggin*, 2 Story, 213, 230, 241.

In the present case the payment for each acceptance was made

in Boston to Glyn, doing business in Boston as Benson & Co. It was not made by bill, but generally in gold or currency. Benson & Co. of Boston (Glyn) received it in this manner, but in remitting to Benson & Co. of London did not remit these payments separately, but remitted from time to time on general account.

In each case the exact amount of the draft plus expenses, &c., was paid to the Boston agency. Of the purpose of the payment there can be no doubt. The fact that the Boston agency remitted the money with other money to London cannot diminish the rights of the complainants.

It is true the respondents deny that there was any understanding that the moneys were sent to meet any specific draft, but besides the other evidence, the fact that the settlements were made as they were is entitled to great weight. The moneys were not paid on general account, and by the terms of the agreement itself were not to be so.

If the remittance consisted of some particular security, or a package of money, intended to be applied to a particular debt, and the receiver did not apply it, he might be guilty of a conversion. But if one man pays money to another for a special purpose, even without any understanding that it is not to be mixed with his own, and he does not so apply it, the obligation to repay it seems plain, and that he is unable to repay does not affect the obligation.

In *Vaughan* v. *Halliday*, L. R. 9 Ch. App. 561, a Brazil party drew on a party in Manchester, England, for £2,000, and at the same time inclosed bills "to cover the above exchange operation." The Brazil and Manchester parties both stopped payment, the bill not being accepted. The plaintiff had bought the bills for value of the Brazil drawers. The Court of Appeals agreed with the court below, Bacon, V. C., that the bills were remitted expressly to take up the acceptances if the drawers did accept. "Then the rule of law is applicable that if a remittance is sent for a particular purpose, whether it be a remittance by bill or a remittance in money, the person who receives the remittance must either apply it to the purpose for which it was sent or else return it," p. 568. But in this case, as the plaintiff had not

himself sent the securities to pay the bills, but had simply bought and paid for the draft, it was held he could not recover.

In the case *In re Gottenburg Commercial Company*, the decision of Malins, V. C., is reported in 28 Weekly Reporter, 456. Bills were remitted from Sweden to London to meet bills accepted in London. The acceptors were paid by commission, and had leave by the arrangement to get the bills sent discounted and use the funds, paying interest on them. The acceptors failed. The case came before the Chancery Appeal Court January 19, 1881, and that court held that a line must be drawn at the date of the London failure, and that the senders of the bills were entitled only to those not then discounted. This was in bankruptcy. 29 W. R. 358.

The question of how far specific funds can be traced in bankruptcy has been considered in several English cases to which we are referred : 2 White &. Tudor Lead. Cas. Eq. 4th Amer. ed. 1652 ; *Ex parte Gomez*, 23 W. R. 780 ; also L. R. 10 Ch. App. 639 ; *Johnson* v. *Robarts*, 23 W. R. 763 ; *In re Hallett's Estate*, L. R. 13 Ch. Div. 396.

And whether it would be a liability growing out of fraud or breach of trust, and therefore not protected under the English statute by the discharge, we do not consider here. It is simply the duty to apply money to the purpose for which sent, or to return it. If Benson & Co. had without acceptance remained solvent, there could have been no doubt. The failure to apply it does not necessarily involve either fraud or breach of trust, but may happen from various causes.

So far as the question of double liability is concerned, it seems very simple. The London firm have agreed with the Boston firm that they will transmit money in a certain way, *i. e.* will accept and pay certain drafts for payment of goods. If they pay the drafts, all liability, not only to the holders, but to the Boston firm, ceases. If they do not, they have no one but themselves to blame that they may, to some extent, be liable to both.

It is the common case of a conditional liability. The Naples vendor gets his pay, as he has a right to expect under the agreement, by selling the drafts. They not being paid by the acceptor, he is obliged to repay the holders. If the holders receive a divi-

dend, it lessens the amount he has to pay back. But being defeated in getting his pay in this way, he falls back on his original claim on the Boston firm, and they have settled it, presumably less the dividend, as they were bound to do if the other mode of payment failed.

The argument of the counsel for Benson is very ingenious. If A. sends money to B. to pay to C., then, after B. attorns to C., B. is liable to C. But is B. discharged by this from liability to A., unless C. has agreed to accept B.'s liability instead of A.'s? And if this is not done, has not A. still an action against B.? If the Naples vendor had agreed to take these acceptances as payment, and not to look to the Boston purchasers, that would have altered the case. But that is not this case.

It is not merely because the London firm contracted with the Boston firm to accept and pay in London certain bills which they owed the bill holders that they are liable in this suit, but because the Boston purchasers paid money to the agent of the London firm for the purpose of paying the drafts, and they did not so apply it. And counsel admit that " if the liability to C. is ended without B. having made the payment, it is conceded there is an implied contract to repay the money to A." If there is a double liability, there need be but one payment. If the party in fault has paid a part upon his primary contract, which was to accept and pay the draft, he is only liable for the remainder upon his conditional contract, to pay back the money if he does not pay the draft. The respondent's counsel seem to take the view that if the drafts were accepted that was a compliance with their contract, even if never paid. We cannot assent to that.

The counsel for Benson & Co. contend that on non-payment of the drafts, the Boston firm might have resorted to two courses. *First.* To wait and see what the Naples drawer could collect and then pay him the difference. Doubtless whatever Budillon collected on the drafts would make so much less for the Boston firm to pay, and so now it is in the power of the court to make provision for this. *Second.* By paying the Naples vendor the whole purchase money, which counsel say they were not obliged to do until the acceptances were given up. If the person liable on a draft has a claim on another to pay it, he may be obliged to take

it up before he can sue.   But here the Boston firm do not sue on the drafts or acceptances.   They were indeed liable to pay for the goods, but were they liable on the acceptances in any other way than by their agreement, which was to send money to take them up?   The London and Naples parties knew what this agreement was.   If the London firm had paid the acceptances, they would use them in settlement with the Boston firm, to show that they had properly applied the money sent.

But the respondents cannot be permitted to urge that as an objection, it being their own fault that the acceptances are wherever they are.

The respondents cannot be liable twice.   If sued by the complainants on the contract contained in the letters, it would be a complete answer to show that they had paid the acceptances, which they would then have in their possession for their defence ; and if they or their estate in bankruptcy have paid any part, it might be proved and would be credited in their favor.   Whether the Westminster Bank or Budillon ever receive any further dividend, and how they settle it with each other, is a matter between them.   But Benson & Co. have undoubtedly a right to have the benefit of all payments on the drafts to whomsoever made, in settlement with the complainants.

And the fact that the drafts were proved in bankruptcy cannot affect the right of the complainant to recover.   The then holders, being subjects of Great Britain, had a right to prove them, and if they had not done so might, under some decisions, have been cut off from all relief, even if they could have found property abroad.   But the complainants have in no way submitted to the jurisdiction of the English courts.

If, then, Benson & Co. of London were bound to repay to Goodsell, Budillon & Co. of Boston the moneys advanced, was not the obligation to repay at the residence of the creditors in Boston ?   The contract to repay is implied by law, and of course no place is designated by the parties.   We think that on reason and on the English and American authorities it was, and if so, it would not be discharged.

Savigny, one of the most celebrated of European Continental jurists, held that where there was no place fixed for payment the

*seat of an obligation* was at the domicil of the obligor. Savigny
System, vol. 8, §§ 369–372;[1] Guthrie's Savigny, 163, 175. Bar,
also, one of the most learned of the modern European jurists,

[1] NOTE.— " Obligation," as the word is used by the civilians, expresses the
reciprocal relations which exist between the persons described in our law as
" obligor and obligee," when these words are used in their broadest contractual
meaning. " *Obligatio est juris vinculum quo necessitate adstringimur alicujus
solvendæ rei secundum nostræ civitatis jura.*" Inst. De Obligationibus, 3. 13.
" *Obligationum substantia non in eo consistit, ut aliquod corpus nostrum, aut servi-
tutem nostram faciat, sed ut alium nobis obstringat ad dandum aliquid, vel facien-
dum, vel præstandum.*" L. 3, pr. D. De Oblig. et Act. 44. 7.

Savigny in the passage of his System des Heut. Röm. Rechts above referred
to, vol. 8, p. 200, begins his discussion with " the constantly recurring ques-
tion," " Where is the true seat of every obligation ? " der wahre Sitz jeder Ob-
ligation, " in what spot in space does the obligation have its home ? " for from
" this home must we determine the jurisdiction applicable to the obligation,
and the local law which controls it." " Every obligation has essential refer-
ence to two different persons : in regard to one it appears as an enlarged lib-
erty, a control over another's will; in regard to the other as a restricted liberty,
a dependence upon another's will. From which of these closely connected yet
different relations shall we determine the seat of the obligation ? Without
doubt from the relation of the debtor, since the necessity of an action imposed
on the debtor is what gives rise to the very existence of the obligation." p. 205.
" Three connected questions have been propounded above : Where is the seat
of an obligation ? Where is its special jurisdiction ? Where is the local law
to be sought applicable to it ? The first of these questions is in its nature the-
oretical, and only serves as a help to properly answer the other two. We may
therefore join the first question with the second. This second question as to
the jurisdiction has led, in the Roman Law, to a series of practical decisions
which involve much detail."

After a prolonged discussion Savigny gives, p. 226, the following rules to
determine the proper jurisdiction :

1. " It is found at the place of performance fixed by the will of the parties,
whether this place is expressly named or is determined by the nature of the act
required by the obligation : the act being one possible in only one place.

2. " If no place of performance is fixed, the jurisdiction may be determined
by the fact that the obligation arises from a transaction on the part of the debtor
which is confined to a definite place.

3. " The jurisdiction is determined by the place where the obligation is entered
into if this place is the domicil of the debtor.

4. " The place where the obligation is entered into, even if it is not the dom-
icil of the debtor, may yet determine the jurisdiction, if from the circumstances
of the transaction performance is expected at that place.

5. " If none of the above conditions is present, jurisdiction is determined
by the domicil of the debtor.

holds to the same doctrine.   Wharton Conflict of Laws, §§ 401 *a*, 401 *n*.

" All of these cases, different as they appear and accidental as their connection seems, may be referred to one general principle.   The place of performance always determines the jurisdiction, whether this place is expressly fixed (No. 1), or depends upon tacit expectation (Nos. 2–5)."

Savigny then proceeds to examine the question of the local law applicable to obligations, and sums up his conclusions by referring to the rules above given for the jurisdiction, as also fixing the local law, together with the following, p. 247:

The local law applicable is to be found:

1. " At the place of performance when such place is fixed by the obligation.

2. " If the obligation arises from continuous business transactions on the part of the debtor, then at the place where such business is permanently located.

3. " If the obligation arises from a single act done by the debtor at his domicil, then at the place where such act was done; but a subsequent change of domicil does not change the applicable law.

. 4. " If the obligation arises from a single act done by the debtor away from his domicil, but in circumstances which lead to the expectation that the performance will take place where the act was done, then at the place where such act was done.

5. " If none of these conditions is present, then at the domicil of the debtor."

The local law does not however apply, p. 248:

1. If it is opposed by a positive rule of law in force where the obligation is litigating.

2. If it is excluded by an expressed declaration of intention made by the parties to the obligation.

3. In some other cases which are explained at considerable length by Savigny.

In his fragment on obligations, Obligationenrecht, vol. 1, § 49, p. 508, Savigny speaks more directly to the point discussed in the above opinion. In treating of the place of performance he finds two cases : 1. Where the obligation fixes a place.   2. Where no place is fixed.   In the latter case, p. 513 :

" The creditor may pursue his claim, begin suit, and compel performance wherever he wishes, as the obligation leaves him in this respect entire freedom," subject of course to the limitation that the suit is brought before a court having jurisdiction and to certain reasonable restrictions: thus, p. 514, " if the obligation is for the transfer of a movable article and is also a *bonæ fidei obligatio*," the creditor must be satisfied with a transfer at the place where the article may chance to be, and cannot subject the debtor to the expense and risk of bringing the article to the place of suit.

Phillimore International Law, vol. 4, §§ 467, 474, copies from Savigny, as to the seat of obligations generally.

"It remains to consider the position of the debtor when no place of performance is fixed. If, dealing with abstractions, we assume that because no place is fixed the debtor has an unlimited choice of his place for voluntary performance, then the debtor may in any remote spot of the earth's surface tender and deposit a sum of money and thus extinguish his debt; he may do this to cheat his creditor, or because he chances to have in such remote spot a supply of money, and thus may find his own profit in such a mode of payment. It is, however, clear that this would not fulfil the original intention of the parties nor the true meaning of the transaction.

"The sources of the civil law contain nothing which decides this question."

Fried. Ludw. von Keller solves this difficulty, Pandekten, § 260, as follows: "If no place of performance is fixed the debtor, as a general rule, may perform where he wishes, provided it be *loco opportuno.*"

Savigny however continues, Obligationenrecht 1, p. 515: "The most natural decision of this question assumes perfect equality between the two parties. Hence we must allow to the debtor his choice of those places where the creditor could have sued him, that is the debtor's place of residence, and every place where the obligation in question could be submitted to a competent jurisdiction. There can be no doubt that this accords with the meaning of the transaction, since the expectation of the parties must from the beginning have been directed towards each one of these places. If the creditor is not satisfied with the choice of the debtor the creditor may thank himself, for by instituting a suit he could have determined the debtor's election, and have selected the place of performance."

Puchta, Savigny's successor in the University at Berlin, gives a very different answer. In his Pandekten, § 246, he says simply: "If the debtor wishes without suit to perform the obligation, he must naturally find the creditor and do it, ' So muss er es natürlich bei dem Gläubiger thun.' " And he adds in a note, "The common opinion, ' place of receipt and domicil of the debtor,' has in its favor neither the nature of the matter nor the written law, which on this point is silent."

In his lectures on the present Roman Law, published after his death by Rudorff, Puchta expresses much the same views. Vorlesungen 2, § 246: "The omission of this whole question from the written law indicates that the true decision is very simple. As no place is prescribed for performance, the debtor may *legally* perform where he *naturally*, actually is able to do it; hence, as the presence of the creditor is necessary for the payment, where he meets his creditor, provided it is *loco opportuno.* An exception is to be made in case of a gift; here the relation of the parties is such as to make the donor's house the place of performance. Otherwise, neither the debtor nor the creditor has a right to expect the other to seek him. Consequently, if a payment is to be made to one who is away, the debtor must pay the costs of transmission in the absence of any special agreement."

We can easily understand the meaning of the phrases, place of contract, place of performance; but the *seat of an obligation* is a phrase which needs definition before we can assent to the doctrines laid down by Savigny, Bar, and others, in regard to it. If the *seat* of an obligation means the place where an obligation rests upon any person, then the obligation rests upon the obligor, and may, perhaps, be said to have its seat at his residence. But this would be merely drawing an inference from a definition we have previously made so as necessarily to include the inference.

If I promise to pay money to a man at a specified time without specifying any place, I am bound to pay at the residence of the payee. He is not obliged to seek me.

It is true if I do not pay, he may be obliged to seek me at my residence to sue me, or may sue me wherever he can find me. So also if he trustees money or debts owing from me. But this relates to the remedy, — the means afforded by the laws for enforcing an obligation, and not to the obligation itself. And it is from confounding these essentially different matters that much of confusion has arisen.

If I promise to pay money to a man on demand, he may be obliged to come personally or by an agent to my residence to demand it. But after demand made, the resulting obligation is to pay him.

In this case, as in the former, the *remedy* would be against me wherever found.

But the *obligation* is to pay to the payee or promisee, — in other words, the residence of payee is the *place of performance* if no other be agreed upon.

But the promisor is not bound to go out of the realm to make a tender.

And if the rules laid down by Savigny and others regarding the seat of an obligation are sound in relation to obligations generally, it will be evident from the cases we shall refer to that they do not apply to all contracts and not at all to money debts.

And while, as we have said, there is contrariety of opinion as to the place where other obligations are to be fulfilled or performed, there is not much in regard to debts or contracts for payment of money.

Savigny, indeed, does not except debts.  Bar expressly includes them.  See Guthrie's Savigny, p. 102, and Wharton Conflict of Laws, §§ 401 *a*, 401 *n*.  Pothier, with one or two exceptions, makes the debtor's residence the place of payment, on the ground that the agreement ought to be interpreted in the mode least burdensome and expensive to the debtor.  Pothier on Obligations by Evans, Nos. 512, 513.

On the other hand, in *Odwin* v. *Forbes*, the Court of Demerara say that "debt and right of action are considered as following the person of the creditor, although to recover them he may be obliged to follow the *forum rei*," &c., &c.  Henry on Foreign Law, 112.  This judgment on appeal was confirmed by the English Privy Council, *Odwin* v. *Forbes*, Buck Bankruptcy Cases, 57.

So Dwarris on Statutes, *650 : Debts and rights of action attend the person of the creditor, *inhærent ossibus creditoris*, but to recover them he must follow the *forum* of the debtor.

And Livermore, the earliest American writer on the subject of the Conflict of Laws, who, although an American, yet writing in Louisiana, drew his principles and authorities from the civil law, and who is said to have "been the most accomplished civilian then living whose vernacular was the English language," says : "It was formerly doubted by some whether personal actions should be considered as movables, and whether they should not be considered to have a location at the domicil of the debtor. But the common opinion seems to be well settled, that considered *actively*, and with respect to the interest of the creditor and his representatives, they must be considered as attached to the person of the creditor."  And he cites the authority of Dumoulin and Casaregis.  Livermore Dissertations on Contrariety of Laws, p. 162, No. 251.

And the American authorities are very strong, and many English authorities agree with them.  Judge Story, Conflict of Laws, §§ 395, 399, lays down that debts of themselves have no locality, but follow the person of the owner ; and he cites Lord Kames as holding that it is a natural fiction to place the debt with the creditor and to consider it as in his possession.  And see also Story on Bills of Exchange, § 158.

Phillimore follows Judge Story, and excepts debts and personal

property contracts from his general rules respecting the seat of obligations. International Law, vol. 4, §§ 544, 566, 759. See, also, Wharton Conflict of Laws, § 359.

That a debt follows the person of the creditor has been decided in many American cases. In *Atwood* v. *The Protection Ins. Co.* 14 Conn. 555, it was contended that as the debt was due from a corporation located in Connecticut, the debt was located there. The court held that it followed the creditor and was governed by the law of his domicil. In *Clark* v. *Connecticut Peat Co.* 35 Conn. 303, 307, the court held the same doctrine. So in *Goodwin* v. *Holbrook*, 4 Wend. 377 ; *Braynard* v. *Marshall*, 8 Pick. 194 ; and these cases are recognized in *Towne* v. *Smith*, 1 Woodb. & M. 115, 128, and in *Poe Garn. of Lientard* v. *Duck*, 5 Md. 1, 5. In *Smith* v. *Smith*, 2 Johns. Rep. 235, there was a question of the validity of an insolvent discharge under the law of Rhode Island. A Rhode Island debtor had given a note to a resident of Massachusetts. It was argued that the plaintiff would be obliged to look to the debtor in Rhode Island for performance, and therefore the discharge was good. The court held the contrary. In that case the note had been dated in Massachusetts. And Parsons, 2 Contracts, *586, *587, lays down the law as we have stated, that although, if no place is fixed, payment may be demanded or the debt sued anywhere, the debt follows the creditor, citing *Blanchard* v. *Russell*, 13 Mass. 1, 6, which is plain upon that point.

So in *Speed* v. *May*, 17 Pa. St. 91, 94, the court holds that the legal *situs* of the property, in that case a judgment debt, follows the person of the owner. And in *Kirtland* v. *Hotchkiss*, 10 Otto, 491, 498, the United States Supreme Court held that a debt was property in the hands of the creditor, and that for purposes of taxation, if not for all purposes, the debt must be considered as situated at the domicil of the creditor.

So in *Lewis* v. *Owen*, 4 B. & A. 654, a person in Ireland drew a bill on London, which the plaintiff accepted and paid for his accommodation. Held an Irish discharge was no bar, as the debt arose in England. This could only be on the ground that the debt belonged to the creditor in England, and was payable there, and not in Ireland. This case arose under the old Irish bankrupt law before the Union.

If therefore there was an obligation to repay to the Boston purchasers, as we consider there was, we must hold that the seat of the obligation in the present case was in Boston, the residence of the creditors.

It is very evident, too, that all the decisions in bankruptcy which have held that a foreign creditor was not barred by a discharge unless the debt was payable in the country of the discharge must have proceeded on this ground, tacitly or expressly. For if the seat of the obligation was the domicil of the debtor, the operation of a discharge in bankruptcy would have been much more extensive than it now is.

But while we hold that there was a contract on which the complainants could sue, and that there was an implied contract to repay at the residence of the creditor, and which therefore in our opinion was not discharged, we think it is also well settled that a foreign discharge is of no avail against a domestic attachment.

The complainants attached property in the United States which belonged to the London firm, after their discharge under the English bankrupt act, but before the assignees had obtained possession of it.

While it is the general rule that a discharge of a contract good by the law of the place of performance is good everywhere, it is not without exception. Story Conflict of Laws, § 335, &c. So far as concerns releases between the parties themselves, modes of payment, novation, set-off, tender, and the modes of execution of acts which constitute a release, there is a general agreement of authorities.

The modes of release we have spoken of may be said to constitute a part of the understanding under which every contract is entered into. They are known to the laws of all nations; they form a part of the general mercantile law, and are recognized in international law. For instance, whether a contract was made or to be performed in England or this country, a release under seal made in either country would be recognized in the courts of the other.

But bankruptcy cannot be said to constitute a part of the general mercantile law. Its processes are entirely statutory. The discharge is the effect of statute law, variable from time to time, and a foreign statute as such has no extra-territorial effect.

Nor can it be said that bankrupt discharges enter into the agreement and form a part of the contract. Foreign laws may act upon a contract when sued in the *forum* of the foreign law, but do not enter into it. So held by Judges Marshall, Story, and Duval, in *Ogden* v. *Saunders*, 12 Wheat. 213, 332, 343; Story Conflict of Laws, § 261.

And while it is a general rule that a discharge in bankruptcy in the country of the performance of the contract will be recognized in other countries, it is, as will be seen, as a matter of courtesy, and liable to many exceptions. Story Conflict of Laws, § 335. And the tendency of decisions, both in England and this country, has been to more and more restrict its operation, as we shall show.

The American cases are very strong against allowing to foreign bankruptcy proceedings any extra-territorial effect. The foreign assignee is only recognized as representing the debtor, as having a right to collect personal property here to the same extent and no further than the debtor himself could. Whether he could sue a chose in action in his own name must depend on the laws of the several States. He is, as to creditors here, a mere voluntary assignee, and while allowed to sue in our courts, his claims will not be sustained against domestic creditors. Story Conflict of Laws, §§ 346, 348, 349, 351, 400, 412, 565, 566; Wharton Conflict of Laws, §§ 843, 844; *Betton* v. *Valentine*, 1 Curtis, 168, 173. The bankrupt may still control it except so far as creditors have gained rights, and except so far as the court at home may act upon his person. *Upton* v. *Hubbard*, 28 Conn. 274; *Taylor* v. *Geary*, Kirby, 313; and see Wharton Conflict of Laws, §§ 353, 391, and the discussion in *Hoyt* v. *Thompson*, 5 N. Y. 320, 340, 348, 349, 352; *Abraham* v. *Plestoro*, 3 Wend. 538; *Estate of Samuel Merrick*, 2 Ashm. 485, also 5 W. & S. 9, 19; *Johnson* v. *Hunt*, 23 Wend. 87, 94, 96, and cases cited in 3 Parsons on Contracts, *451, *453. He takes subject to all equities. *Mitchell* v. *Winslow*, 2 Story, 630; *Robinson* v. *Crowder, Clough & Co.* 4 McCord, 519; *Holmes* v. *Remsen*, 20 Johns. Rep. 229, 258.

A foreign assignment may be allowed to operate abroad in certain cases; and while in England, Holland, and France, the law

may be the other way, it cannot be disputed that in the United States a foreign assignment will not be allowed to prevail against a domestic attachment, even if the attachment be subsequent to the assignment. 2 Kent Comment. *407. The principle is, that our courts will give no effect to foreign assignments which conflict with the rights of our own citizens. The discharge, as well as the assignment, is equally a foreign statutory proceeding, and the same reasons apply in both cases. Wharton Conflict of Laws, § 852 *a.* No nation is bound to enforce laws prejudicial to the rights of its own citizens. Bankruptcy and insolvent laws come within that class. *Hoyt* v. *Thompson*, 5 N. Y. 320, 349.

" There is a wide distinction," says Chancellor Kent, " between a discharge under the authority of the government where the suit is brought, and a discharge obtained abroad, which has no *authority* here, and is admissible only upon the ground of comity." *Murray* v. *De Rottenham*, 6 Johns. Ch. 52, 61.

To hold that a foreign assignment does not pass property here, and still that the discharge puts an end to the debt, and so an attachment falls, there being nothing to sustain it, seems inconsistent. It would be in most cases useless to attach, and creditors here would lose all protection from our own laws, and be compelled to resort to the expensive process of proving their debts abroad.

And the most oppressive effect of doctrines so inconsistent would be, that while a considerable portion, or in some cases all, of his debts here would be discharged by his merely giving up his English property, it would leave any property he might have here still in his ownership and control.

It will be seen that while most of the decided cases were cases between the creditor here and the foreign assignee, many of them refer to bankruptcy proceedings generally. Both are foreign statutory proceedings, and the Supreme Court of the United States in *Ogden* v. *Saunders*, 12 Wheat. 213, 360, say, " that since the power to discharge the bankrupt is asserted on the same principle with the power to assign his debts, the departure from it in the one instance carries with it a negation of the principle altogether." The court go on to review many cases. They say, p. 361: " In the case of *Harrison* v. *Sterry*, 5 Cranch,

289, it is expressly adjudged upon full argument and great deliberation, that in the case of a contract made with foreigners in a foreign country the bankrupt laws of the foreign country are incapable of operating a legal transfer of property in the United States. . . . In that case also another important doctrine is established in hostility to the British doctrine. For the United States had interposed a claim against the English assignees in order to obtain satisfaction from the proceeds of the bankrupt's effects in this country for a debt contracted in Great Britain." The United States had attached property of the bankrupt here. " And this court decreed accordingly, expressly restricting the power of the country of the contract to its concoction and exposition." The power asserted by the British courts upon their metaphysical ideas on the subject of jurisdiction over contracts is a power " asserted over the rights of creditors which involves a mere mockery of justice." p. 365. " Every bankrupt or insolvent system in the world must partake of the character of a judicial investigation. Parties whose rights are affected are entitled to a hearing. . . . But on what principle can a citizen of another state be forced into the courts of a state for this investigation ? " p. 366. " It has been solemnly adjudged in this court . . . that, notwithstanding the laws of bankruptcy in England, a creditor of the bankrupt may levy an attachment on a debt due the bankrupt in this country." pp. 360, 361. " This country does not recognize the doctrine that the bankrupt law of the country of the contract is paramount in disposing of the rights of the bankrupt." p. 361. " The right to attach imports the right to sue the bankrupt." p. 365.

The reasoning of the court in *Ogden* v. *Saunders* is important, because the court first considers cases of bankruptcy as between foreign or independent States, and this at considerable length. They afterward proceed to consider the effect of the United States Constitution on them.

And as to what this case did decide we have high authority.

Says Judge Redfield, in his edition of Story's Conflict of Laws, § 341 *a :* " And if it be answered that this view would result in denying the validity of discharges under general bankrupt laws except as to parties within their jurisdiction, we can only reply

that this is precisely the view taken of this latter question by Mr. Justice Johnson in giving the opinion of the court in *Ogden* v. *Saunders*," &c.

" And in *Braynard* v. *Marshall*, 8 Pick. 194, the court consider the case of *Ogden* v. *Saunders* as holding that a State discharge has no effect beyond the limits of the State, even if the contract was to be performed there. And see, also, *Blake* v. *Williams*, 6 Pick. 286, 306, and *Marsh* v. *Putnam*, 3 Gray, 551, 557. And the ground here taken, that insolvent systems of every kind partake of the nature of judicial investigations, and parties have a right to be notified and heard, is reiterated by the United States Supreme Court in *Baldwin* v. *Hale*, 1 Wall. 223, 233, by Clifford, J. See, also, Woodbury, J., in *Towne* v. *Smith*, 1 Woodb. & M. 115, 133 ; Story Conflict of Laws, §§ 344, 351.

The effect of the oft cited case of *Abraham* v. *Plestoro*, 3 Wend. 538, reversing the decision of the same case in 1 Paige, 236, as understood by the Supreme Court of New York, is well stated in the opinion of Cowen, J., in delivering the opinion of that court in *Johnson* v. *Hunt*, 23 Wend. 87. The court hold that, even as between subjects of the country granting the discharge, it has no extra-territorial effect ; that the debtor on crossing the line may convey his foreign property, and that it may be attached abroad. And the judge says, p. 94, that by the decision in *Ogden* v. *Saunders* all assignments coerced by foreign laws are placed on the same footing, *even those which result in a discharge* of the bankrupt's contracts.

This principle was acknowledged in *Blanchard* v. *Russell*, 13 Mass. 1, 6, and was actually applied in *Prentiss* v. *Savage*, 13 Mass. 20, 24, where the court held a foreign discharge of no effect as against a creditor here, the law of Jamaica, where the debt was due, having provided for only thirty days' notice to creditors.

The disposition to give decisions in bankruptcy the same effect as a judgment, binding only on those having notice or making themselves parties to the proceedings, seems strongly manifested. See Washington, J., in the United States Circuit Court in *Banks* v. *Greenleaf*, 6 Call, 271, 277, and cases *ante*. A foreign government may prescribe any mode of notice, and make it effectual

as to its own citizens, but cannot bind foreigners. And certainly when the practical effect of a bankrupt act is by the notice prescribed to give foreigners but little opportunity to come in and prove their debts, and thus secure the property to the home creditors, a foreign court may consider this in deciding what weight they will allow to the discharge. Story Conflict of Laws, § 337.

And while if the language used was confined to a single case it might be considered as mere *obiter dictum*, the fact that the language of the judges is in so large a number of cases applicable to all bankruptcy proceedings, discharges as well as assignments, may well be admitted as some evidence of a general understanding of the state of the law. And the same remarks may be made as to the general *consensus* of commentators. They evidently consider all the proceedings as standing on the same ground as to their legal effect. And see *Saunders* v. *Williams*, 5 N. H. 213.

Besides the authorities, *Ogden* v. *Saunders*, 12 Wheat. 213, 360, and Wharton Conflict of Laws, § 852 *a*, to which we have referred as especially touching discharges, it is laid down by Wheaton, one of the standard authorities on international law, see Lawrence's 2d annotated edition, 178, 284, that while as a general rule a discharge in the country where the contract was made is a valid discharge everywhere, that by the decisions in the United States courts the *lex loci rei sitæ* prevails so far that the laws of other States cannot have operation in the United States to the prejudice of the rights, authority, and interest of the States where the property lies; and the Supreme Court of the United States has therefore decided that not only the government but private creditors attaching are to be preferred to the claims of the foreign assignee, citing: *Royal Bank of Scotland* v. *Cuthbert*, 1 Rose, 462; 2 Kent Comment. *392, *404–*408, *459; *Harrison* v. *Sterry*, 5 Cranch, 289 ; *Ogden* v. *Saunders*, 12 Wheat. 213.

So Phillimore, International Law, vol. 4, §§ 551, 562, 563, 788, while laying down the rule as established, that what is a discharge in the country of the contract, which he considers is where it is to be performed, see § 656, is a discharge everywhere, says it is subject to this limitation : that the discharge must not

" be manifestly injurious to the clear and fair rights of the native subject whose state is called upon to recognize the validity of the discharge." And the same principle is recognized in Story Conflict of Laws, §§ 349, 351.

In the case of *Milne* v. *Moreton*, 6 Binney, 353, an American creditor had attached property in this country belonging to an English bankrupt who had obtained his discharge in England. Counsel disagreed as to the locality of the contract, and the court, a majority of whom held that the seat of the contract was here, decided the case upon the other point, that the assignment passed no title. They reviewed the decisions very fully.

And some of the cases give a very reasonable ground for these doctrines. An English discharge, although in the English courts it is held good as to all debts no matter where contracted or payable, if provable, see *Ellis* v. *McHenry*, L. R. 6 C. P. 228 ; Foote's Principles Internat. Law, 381 ; Leake Digest of Law of Contracts, 1037 ; *Gill* v. *Barron*, L. R. 2 P. C. 157, 175, does not have the same effect in foreign courts and countries. It may in England release his person and his future acquisitions, and it may apply to his English and colonial property. But for debts payable here to creditors residing here his discharge is not here acknowledged, and therefore it seems reasonable to hold that his creditors here should have the benefit of his American property. It is analogous to the case of administration where the deceased leaves property in different countries. In both cases it is unreasonable to compel the creditors to pursue their claims in a distant country when there is property at home that can be reached. *Milne* v. *Moreton*, 6 Binney, 353, 363.

In *Tappan* v. *Poor*, 15 Mass. 419, the petitioner had commenced his suit by attachment, and the defendant pleaded a discharge from the State of Maryland, granted since suit commenced. There were several pleas, and the court decided for the plaintiff on several points, but recognized the general doctrine, " But there is a general objection which is conclusive against the defence set up in this case. These acts are not otherwise binding upon the citizens of this State than on the principle of comity : which is never held to apply when the law insisted on in defence is injurious to the rights of the citizens of the State where

the action is brought." The court limit their decision to the case of a prior attachment; but we have seen that in questions upon foreign assignments, attachments made long subsequent to them have been sustained.

Chancellor Kent, in his Commentaries, vol. 2, p. 406, says:

" The laws of other governments have no force beyond their territorial limits, and if permitted to operate in other states, it is only on a principle of comity; and only when neither the state nor its citizens would suffer any inconvenience from the application of the foreign law."

" As the laws of foreign countries are not admitted *ex proprio vigore*, but mainly *ex comitate*, the judicial power will exercise a discretion with respect to the laws which they may be called upon to sanction, for if they should be manifestly unjust or calculated to injure their own citizens, they would not be respected." Parker, C. J., in *Blanchard* v. *Russell*, 13 Mass. 1, 6.

In the case of *May* v. *Breed*, 7 Cush. 15, 41, which was a suit in Massachusetts by a Massachusetts creditor against an English discharged bankrupt, the discharge was indeed held good, as the debt was payable in England, and there was no attachment in the case, but the court, in their opinion, fully recognize the doctrine as settled, that as to property here, the domestic creditor must be preferred to the foreign assignee.

So in *Oakey* v. *Bennett*, 11 How. U. S. 33, 44, the court, by McLean, J., say, that even in English courts an " attachment by a foreign creditor not subject to English laws, made under the local laws of a foreign country, is held valid. . . . . National comity does not require any country to give effect to such assignment when it shall impair the remedies or lessen the securities of its own citizens. . . . . A proceeding *in rem* against the property of a foreign bankrupt may be maintained by creditors, notwithstanding the foreign assignments. See Story Conflict of Laws, § 414.

So in *Booth* v. *Clark*, 17 How. U. S. 322, quoted in Lawrence, notes to Wheaton, 285. In the United States a foreign bankruptcy is held not to preclude the diligence of individual creditors, but they can attach the bankrupt's property as well after as before it. . . . . There is a growing tendency to limit the cases in which

the title of foreign assignees will be respected by the American courts for any purpose. 17 How. U. S. 337. " The courts of the United States will not subject their citizens to the inconvenience of seeking their dividends abroad, when they have the means to satisfy them under their own control."

And for further authorities see *Robinson* v. *Crowder, Clough & Co.* 4 McCord, 510 ; *Topham's Assignees* v. *Chapman*, 1 Mills Const. Rep. (South Carolina) 283 ; 3 Parsons on Contracts, *453, and cases cited by Woodbury, J., in *Towne* v. *Smith*, 1 Woodb. & M. 115, 136, 137.

So in *Speed* v. *May*, 17 Pa. St. 91, 94, and *Milne* v. *Moreton*, 6 Binney, 353, the Supreme Court of Pennsylvania decided that while a voluntary transfer for consideration would divest the title everywhere, an involuntary transfer by foreign bankruptcy of movable property here does not divest the title to the prejudice of the creditors domiciled at the *situs* of the property.

And the English courts lately have used language upon the effect of foreign bankrupt discharges as strong as that we have quoted from *Ogden* v. *Saunders*, and from Judge Redfield, almost going the length of limiting their effects to courts of the country where granted.

In *Armani* v. *Castrique*, 13 M. & W. 443, 447, Pollock, C. B., said : " A foreign certificate is no answer to a demand in our courts. But an English certificate is surely a discharge as against all the world in the English courts." This was not indeed the point in that case, but the language is quoted by Bovill, C. J., in *Ellis* v. *McHenry*, L. R. 6 C. P. 228, 236, where the court hold that a discharge under the English Bankruptcy Act, when pleaded in the English courts, is a bar to any debt contracted in any part of the world," and they quote the case of *Gill* v. *Barron*, L. R. 2 P. C. 157, 175. A discharge in bankruptcy discharges all foreign debts that are provable in bankruptcy from all remedy in the English courts. Leake on Contracts, 2d ed. 1037 ; Foote's Principles Internat. Law, p. 381.

And the same doctrine has been held in other American cases besides those we have quoted. In *In re Zarega*, 1 N. Y. Legal Observer, 40, Betts, J., says a foreign discharge is not deemed here a bar to any action. It would not be " a bar to debts contracted in this country or due to citizens of this country."

In *Munroe* v. *Guilleaume*, 3 Keyes, 30, before the New York Court of Appeals, the debt was accepted and payable in England, and the English discharge was held not good here. Davis, C. J., puts it on the ground that the plaintiffs were not subjects of Great Britain nor domiciled there, and had not in any way become parties to it. See, also, *Marsh* v. *Putnam*, 3 Gray, 551.

And even allowing to the bankrupt proceedings a partial effect, there seems to be no difficulty in conforming the judgment in the case to the facts, even in an action at law. For instance, the United States Bankrupt Act preserves certain attachments and liens, but the debtor is discharged from the debt. This is easily reconciled by holding that his person and future property are discharged, but that in applying his present property to his debts the assignee takes subject to the liens, and the judgment is to be modified accordingly. In *Bates* v. *Tappan*, 99 Mass. 376, a discharge under the United States Bankrupt Act was pleaded. The court held that their judgment could be enforced against the property attached, but not *in personam*. So in *Leighton* v. *Kelsey*, 57 Maine, 85, and in *Kittredge* v. *Emerson*, 15 N. H. 227, and in *Peck* v. *Jenness*, 7 How. U. S. 612, 623, the United States Supreme Court recognize this construction, and sustain a judgment rendered in New Hampshire to be levied on the property attached, and not *in personam*. See the form of judgment. The certificate discharges only his person and future acquisitions. The law applies his present property to pay his debts, and gives certain preferences to liens which can only be carried out fully in this mode. See Bump on Bankruptcy, 330, 445 ; *Upton* v. *Hubbard*, 28 Conn. 274.

These decisions under the United States Bankrupt Act illustrate the mode in which the lien acquired by an attaching creditor can be carried out against a foreign bankrupt. See, also, *Davenport* v. *Tilton*, 10 Met. 320 ; *Ives* v. *Sturgis*, 12 Met. 463. And in *Lefeuvre* v. *Sullivan*, 10 Moore P. C. C. 1, 13, Lord Justice Knight Bruce says : "A debtor's person and his general estate before and after his death may by bankruptcy or judicial insolvency . . . . be effectually discharged or protected from a debt to which property specifically pledged for it, specifically charged for it, or specifically made a security for it, may yet remain liable."

The majority of the court are therefore of opinion that the complainants ought to recover their claim against Benson & Co., out of the property attached if sufficient; but that in estimating the amount due from Benson & Co. all dividends paid by Benson & Co., or their estate, upon the drafts, whether to the complainants or any holder of the drafts, are to be deducted; and if it be necessary, the suit can be continued for the purpose of ascertaining the amount.                                    *Decree accordingly.*

*A. A. Ranney, B. B. Hammond & William W. Douglas,* for complainants.                                    .

*William Caleb Loring & John D. Thurston,* for respondents Benson & Co. and Waterhouse.

*Charles Hart & Robert R. Bishop,* for respondent Kidder.